## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**KIARA LOTT, et al.,**

        **Plaintiffs,**                **Case No. 1:23-cv-489**

        **v.**                      **JUDGE DOUGLAS R. COLE**

**RECKER CONSULTING, LLC, et al.,**

        **Defendants.**

## OPINION AND ORDER

Plaintiff Kiara Lott[1] moves the Court to facilitate notice under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., to a group of employees of Defendants Recker Consulting, LLC, (Recker), and LYP Contact Center, LLC, (LYP), who Lott says may have wage claims under the FLSA similar to hers. (Doc. 34). The Court, for the reasons discussed below, **GRANTS** the motion and **ORDERS** the parties to confer about the appropriate notice and consent language.

## BACKGROUND

Time is money—in many facets of life and particularly in this case. Lott and opt-in Plaintiffs Beyonka Hall, Cierra Jamison, Aurora Butler, Gerri Watkins, Ryan Parker, and Tynisha Alford (collectively Plaintiffs) worked as patient care associates (PCAs) for Recker either remotely or at its brick-and-mortar call centers. (Third Am. Compl., Doc. 29 ¶¶ 5, 22–27, #344, 347–48). Plaintiffs allege that Recker failed to pay

---

[1] Although the docket lists Kiara Lott as *the* plaintiff in this FLSA action, once other similarly situated employees opt in by filing a consent, they are joined to the action as plaintiffs. *Gilstrap v. Sushinati LLC*, __ F. Supp. 3d __, 2024 WL 2197824, at *2 n.4 (S.D. Ohio 2024). To date, six additional employees have filed such consents. (Docs. 7, 8, 33).

them for time they worked logging into their computers at the beginning of the day; signing off before lunch and logging in after lunch; and signing off at the end of the day. (*Id.* ¶¶ 55–56, #353). And they allege that Recker implemented a purportedly unlawful time-rounding policy—pursuant to which it rounded time records to the nearest quarter hour—that led to their alleged underpayment (i.e., never receiving payment for logging onto the computers in the morning and after lunch or for logging off before taking a lunch break and before leaving for the day). (*Id.* ¶¶ 48–57, #352–53). Based on this alleged underpayment, Plaintiffs claim that Recker violated the FLSA and related Ohio laws. (*Id.* ¶¶ 110–38, #365–69).

Plaintiffs also assert similar claims against LYP but covering a different time period. (*Id.* ¶¶ 5, 7, 110–38, #344, 365–69). That is because LYP did not enter the picture until November 2022. (*Id.* ¶ 7, #344). Before then, Recker directly employed PCAs, like Lott and the other opt-in plaintiffs, to field calls from healthcare clients' patients for scheduling purposes. (*Id.*; Doc. 35-16, #929–32, 939). In November 2022, though, Recker's rebranding efforts resulted in it creating a wholly-owned subsidiary, LYP, which became the employer for these associates. (Doc. 35-16, #931–32). So Recker is now simply "a holding company" for companies providing various internet technology services, including the healthcare telecommunications services that the PCAs now employed by LYP provide. (*Id.* at #918).

Although Recker owns several other subsidiaries, only Recker (before November 2022) and only LYP (after November 2022) employed PCAs whose job responsibilities apparently match those of Lott and the other opt-in plaintiffs. (*Id.* at

#932, 939–40). Because Plaintiffs treat LYP as merely a continuation of Recker despite the corporate rebrand, they also claim LYP has violated the FLSA and related Ohio laws based on the assumption that LYP uses the same patterns and practices to compensate PCAs that Recker had previously used. (Doc. 29 ¶¶ 110–38, #365–69).

Plaintiffs now seek an Order from this Court to facilitate providing notice of this FLSA lawsuit (with the option to opt in as a plaintiff) to: "All current and former Patient Care Associates who work or have worked for Defendants [(i.e., either Recker or LYP)] at any of their locations at any time during the past three years." (Doc. 34, #412). Defendants have opposed that request, and the matter is now fully briefed. (Resp., Doc. 37, Am. Reply, Doc. 40).[2]

## LEGAL STANDARD

The FLSA requires employers to pay employees for all hours worked and at a rate of one and one-half times regular pay for every hour (or portion of an hour) over eight hours in a day or 40 hours in a week. 29 U.S.C. § 207(a), (e). An employee who is not paid overtime can initiate an action to recover the unpaid wages due on behalf of himself and other "similarly situated" employees. *Id.* at § 216(b). But the "similarly situated" employees join such a suit only after they affirmatively "opt in"—that is, consent in writing and file that consent in the court in which the action is pending. *Id.* The FLSA does not expressly address how similarly situated employees might learn of a pending action that they may be entitled to join. But the Supreme Court

---

[2] Plaintiffs initially filed their Reply on July 11, 2024. (Doc. 39). They filed an Amended Reply on July 12, 2024. (Doc. 40). Since Plaintiffs filed the Amended Reply within their filing deadline, (*see* 6/12/24 Not. Order), the Court can properly consider it.

has interpreted § 216(b) to allow courts to "facilitate[] notice to potential plaintiffs" in FLSA suits. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

The question then is how a court is to decide whether to facilitate notice and to whom such notice should go. Fortunately, the Sixth Circuit recently clarified the two-step notice process district courts must follow in answering these questions. *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1011 (6th Cir. 2023); *see also Hogan v. Cleveland Ave Rest., Inc.*, 690 F. Supp. 3d 759, 772 (S.D. Ohio 2023). The first step, which occurs early in the litigation, requires plaintiffs to show a "strong likelihood" that the other employees to whom they wish to send notice (i.e., potential plaintiffs) are "similarly situated." *Clark*, 68 F.4th at 1011. If the plaintiff makes this showing, the plaintiff may notify those employees of their right to "opt in."[3] *Bunger v. Surge Staffing, LLC*, No. 2:23-cv-2113, 2024 WL 2858699, at *2 (S.D. Ohio June 6, 2024) (citing *Clark*, 68 F.4th at 1009).[4]

The "strong likelihood" standard—which the Sixth Circuit adopted from the preliminary injunction context—"requires a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a

---

[3] The parties (and some courts) confusingly refer to this step as "conditional certification." This Court refrains from using that term since the Sixth Circuit admonished that "the term 'certification' has no place in FLSA actions," given the differences between Federal Rule of Civil Procedure 23 (governing class actions) and 29 U.S.C. § 216(b) (governing FLSA collective actions). *Clark*, 68 F.4th at 1009.

[4] Again, the initial notice determination is merely that—approval of notice to potential plaintiffs. *Clark*, 68 F.4th at 1009 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). The Court's decision to permit notice does not change the nature of the original plaintiff's action by creating a class-like entity with independent legal status, as it would, for example, in the class action context. *Id.*

4

preponderance." *Clark*, 68 F.4th at 1011. Looking to the Sixth Circuit's preliminary injunction caselaw for guidance, that means a plaintiff must make a showing of similarity "so serious" and "substantial" that it is "fair" to send notice to other potential plaintiffs, after which the Court can engage in "more deliberate investigation" (at the second step under *Clark*) as to whether they are in fact similarly situated. *See Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023).

As for what it means to be "similarly situated," the Court is to consider "(1) the factual and employment settings of the individual plaintiffs, (2) the different defenses to which the plaintiffs may be subject, and (3) the degree of fairness and procedural impact of certifying the action as a collective action." *Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 745 (6th Cir. 2019) (cleaned up) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by Plaintiff-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016)); *see also Clark*, 68 F.4th at 1010.[5] Ultimately, a plaintiff is similarly situated to another employee "when they suffer from a single, FLSA[-]violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs."

---

[5] In clarifying the burden plaintiffs must meet to justify initial court-approved notice, the Sixth Circuit seemingly did not disturb what it means to be "similarly situated." *See Clark*, 68 F.4th at 1010. Though the *Clark* Court provided various guidelines a district court may consider in making a similarly situated finding, *id.* at 1010, the Opinion sought to clarify "the showing necessary for the district court to facilitate notice to 'other employees,'" *id.* at 1009; *see also id.* at 1020 (White, J., concurring in part) (reminding district courts that *Clark* "addresses how much a plaintiff must show to satisfy a district court that other employees exist who, upon further inquiry, will be found to be similarly situated to the plaintiff; it does not address the underlying threshold for FLSA similarity, which remains the same"). That means the Court can (and should) rely on pre-*Clark* caselaw explaining what it means to be similarly situated in its analysis. *See, e.g., O'Brien*, 575 F.3d 567; *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017); *Pierce*, 922 F.3d 741.

*O'Brien*, 575 F.3d at 585. Even if a plaintiff presents "individualized and distinct" evidence about the nature or extent of the harm that they suffered, that plaintiff and other employees can still be similarly situated if they are "unified by common theories of defendants' [FLSA] violations." *Id.* Also, the Court must refrain from conducting a stringent analysis because it need not find that common questions of law or fact predominate, as it would in a Rule 23 class action context. *Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017). All told, the objective is to determine whether the "collective litigation would yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'" *Clark*, 68 F.4th at 1012 (quoting *Hoffmann-La Roche*, 493 U.S. at 170).

The second step (which, to be clear, the Court does not reach today)[6] occurs after discovery closes. *Clark*, 68 F.4th at 1009–10; *see also Bunger*, 2024 WL 2858699, at *3. Only then does the Court conclusively determine whether the other employees who opted in are "in fact similarly situated" to the original plaintiff. *Clark*, 68 F.4th at 1010–11.

---

[6] In *Clark*, the Sixth Circuit made clear that step two should not occur until after potential plaintiffs have opted into the collective action. 68 F.4th at 1010 ("We therefore disagree that a district court can or should determine—in absentia—whether other employees are 'actually' similarly situated to the original plaintiffs.").

## LAW AND ANALYSIS[7]

**A.    Plaintiffs Have Shown a Strong Likelihood That They Are Similarly Situated to Other PCAs Under the Three *O'Brien* Factors.**

As noted, *O'Brien* requires the Court to consider three factors: (1) the factual and employment settings of the individual plaintiffs, (2) the different defenses to which the plaintiffs may be subject, and (3) the degree of fairness and procedural impact of certifying the action as a collective action. *O'Brien*, 575 F.3d at 584. The Court concludes that all three point in the same direction—in favor of allowing notice.

**1.    All PCAs Appear to Share Similar Factual and Employment Settings.[8]**

Start with *O'Brien*'s first prong—factual and employment settings. Plaintiffs argue that all PCAs share similar factual and employment settings in three basic

---

[7] The Court pauses to contrast two separate aspects of FLSA litigation: (1) court approval of notice to potential plaintiffs, and (2) court approval of FLSA settlements. The Court's authority to approve notice arises from the Supreme Court's decision interpreting the FLSA in *Hoffmann-La Roche*. There the Supreme Court found an implied judicial power to facilitate notice in FLSA cases. 493 U.S. at 169. When it comes to approving FLSA settlements, though, courts have no such authority. *Gilstrap*, 2024 WL 2197824, at *2. Only the former (court-approved notice) is at issue here. Relatedly, the Court makes no determination here regarding Lott's class action count. (Doc. 29 ¶¶ 139–50, #369–71). For one, Lott did not raise class action issues in her motion. (Docs. 34, 35). And second, the Sixth Circuit has carefully distinguished class actions from collective actions. *Clark*, 68 F.4th at 1009 (noting the difference between the two, but accepting courts' ability to approve notice to potential FLSA plaintiffs). This Court has recognized that distinction, too. *Gilstrap*, 2024 WL 2197824, at *7. If Lott seeks certification on that count, the Court will then address class issues.

[8] Defendants argue that the Court should not consider opt-in Plaintiff Parker's declaration nor opt-in Plaintiffs Hall, Jamison, and Watkins' positions since they apparently did not participate in discovery. (Doc. 37, #1269–70). The Court declines to ignore these opt-in Plaintiffs' respective declarations and positions at this stage for two reasons. First, in both cases Defendants cite in support of their argument, the respective courts dismissed the non-participating plaintiffs in response to motions to dismiss. *Gentrup v. Renovo Servs., LLC*, No. 1:07-cv-430, 2011 WL 2532922, at *1 (S.D. Ohio June 24, 2011) (referring to dismissals related to Docs. 214, 216, 218 in that case); *Hanna v. Marriott Hotel Servs., Inc.*, No. 3:18-cv-325, 2021 WL 6205790, at *5 (M.D. Tenn. Dec. 31, 2021). The motion before the Court here is a motion for initial notice approval, not a motion to dismiss. Second, dismissal is a "harsh

ways: (1) the tasks they perform, (2) the policies that apply to them, and (3) and what the Court will characterize as their "job status". (Doc. 35, #443–44).

### a.    All PCAs Performed Similar Tasks.

As to tasks, Plaintiffs say they and all other PCAs performed the same job functions—answering phone calls, responding to client inquiries, and engaging with clients' patients. (*Id.* at #443). So, for example, in her deposition, Lott testified that a PCA answered phone calls for client medical centers, responded to inquiries made by those clients' patients, and transferred calls to the appropriate medical department. (Doc. 35-5, #470–72). Deposition testimony from opt-in Plaintiff Butler, (Doc. 35-6, #526), and opt-in Plaintiff Parker's sworn declaration, (Doc. 35-7 ¶¶ 5, 13, #570–71), likewise report that as PCAs, they fielded phone calls, responded to inquiries, and transferred calls. Rule 30(b)(6) Representative Powers' testimony further confirms that all PCAs conducted similar telephonic tasks, (Doc. 35-16, #931, 939), as does Rule 30(b)(6) Representative Barron's testimony, (Doc. 35-18, #1048). Perhaps not surprisingly then, in the opposition brief, Defendants largely concede that all PCAs are substantially similar in terms of the tasks that they perform. (*See* Doc. 37, #1256).

### b.    All PCAs Appear to Be Subject to Similar Policies.

Perhaps more importantly, Plaintiffs claim that the same allegedly FLSA-violative policies applied to all PCAs. Specifically, Plaintiffs claim that Defendants'

---

sanction," which explains why the *Hanna* court provided the non-responding opt-in plaintiffs "multiple opportunities to participate." *Hanna*, 2021 WL 6205790, at *5. The Court agrees with that approach. Rather than dismissing opt-in Plaintiffs Parker, Hall, Jamison, and Watkins now, it **ORDERS** them to respond to Defendants' discovery requests by November 27, 2024, or risk future dismissal.

attendance and tardiness policies in combination with Defendants' time-rounding policy resulted in Defendants underpaying Plaintiffs and other PCAs for overtime hours worked. (Doc. 29 ¶¶ 41–49, #350–52; Doc. 35, #421, 436, 443). They highlight three timeframes in a PCA's day: pre-shift, mealtimes, and post-shift. First, Plaintiffs claim that because PCAs had to be "call ready" at the start of each shift (to avoid violating the tardiness policy), they had to boot up and log into their computer five to fifteen minutes early. (Doc. 29, ¶¶ 63–64, #354–55; Doc. 35, #430–33). But to comply simultaneously with the policy prohibiting overtime work, PCAs usually clocked in only seven minutes early. (Doc. 29 ¶ 49, #352; *see* Doc. 35, #425, 431). And under Defendants' rounding policy, time often rounded to PCAs' detriment. (Doc. 29 ¶ 49, #352; Doc. 35, #431). Second, Plaintiffs argue that those same policies prevented PCAs from taking their full 30-minute unpaid meal periods. (Doc. 29 ¶¶ 67–73, #355–56; Doc. 35, #433–35). Third, since PCAs had to take the same five to fifteen minutes to log off at day's end, but could not clock out more than seven minutes after a shift, Plaintiffs again argue that time often rounded to their detriment. (Doc. 29 ¶¶ 74–75, #357; Doc. 35, #435).

The evidence Plaintiffs submit suggests to the Court, at least at this preliminary stage, that they and other PCAs were all subject to these same policies. Lott's Employee Handbook and Confirmation, for example, contains precisely the same attendance, tardiness, and time-reporting policies as each of the other opt-in Plaintiffs' Handbooks and Confirmations. (*Compare* Doc. 35-11 *with* Docs. 35-12, 35-13, 35-14, 35-15). And that similarity appears to extend over to PCAs employed both

before and after the rebranding that led to LYP acting as the PCAs' employer. (*Compare* Doc. 35-8, #606–10 *with* Doc. 35-10, #690–95). Defendants' answers to Plaintiffs' interrogatories and their responses during the Rule 30(b)(6) depositions further confirm that PCAs were subject to the same policies on attendance, overtime, and the rounding of time sheets to the nearest quarter hour. (Doc. 35-16, #931, 939–40, 956–60; Doc. 35-18, #1023, 1029–30, 1041; *see* Doc. 35-22). And given that, as noted above, the PCAs apparently all performed similar job functions, it is likely that these policies would impact them in uniform ways. All told then, this amounts to ample evidence that Plaintiffs and other PCAs are "unified by common theories of defendants' statutory violations." *O'Brien*, 575 F.3d at 585.

Defendants argue to the contrary, claiming that a "myriad of variables impact[]" a PCA's shift, and that, accordingly, Plaintiffs cannot show a strong likelihood that Defendants had a uniformly applicable policy requiring PCAs to clock in after beginning or clock out before completing compensable work. (Doc. 37, #1259–61, 1265). For example, Defendants claim that PCAs could choose to clock in and out either via a computer app or via mobile device app—the latter method obviating the need to boot up one's computer first. (*Id.* at #1258). Beyond that, they say that PCAs could start their computer from and exit their computer to different modes (e.g., complete shutdown, fully rebooted, locked position), which changes the time a PCA needs to prepare for or terminate a shift. (*Id.* at #1259–63). And those variables, Defendants argue, indicate that Plaintiffs cannot establish a uniform policy requiring all PCAs to engage in uncompensated work. (*Id.* at #1265).

The Court finds Defendants' argument unconvincing for two reasons. To start, Defendants mistake the nature of what a plaintiff must allege to permit a finding that a policy renders employees similarly situated. Specifically, the Sixth Circuit has made clear that neither the FLSA's text nor purpose compel a plaintiff to show that a company's policy resulted in underpaying all affected employees in exactly the same way or "by a singular method." *Monroe*, 860 F.3d. at 403. In *Monroe*, for example, the technician plaintiffs alleged that mangers told them to underreport overtime hours worked, resulting in an unlawful "company-wide time-shaving policy." *Monroe*, 860 F.3d at 394. The technicians then complied with that unlawful policy in various ways, some working before start times, others during lunch breaks, still others after end times. *Id.* But the Sixth Circuit nonetheless affirmed the district court's similarly situated finding, concluding that, despite technicians taking different measures to comply, the overarching time-shaving policy unified the claims by a common theory. *Id.* at 404.

So too here. Defendants may be right that no policy of theirs *explicitly* required PCAs to boot up computers before clocking in or to shut down computers before clocking out. (Doc. 37, #1254–55). But Plaintiffs' argument that competing pressures between Defendants' uniform tardiness and overtime policies (which *effectively* required PCAs to clock in after beginning or out before completing their compensable activities) in combination with Defendants' uniform time-rounding policy parallels the allegations in *Monroe*. The Court thus sees no problem with Plaintiffs' failure to "identify *one* policy" that violates the FLSA. (Doc. 37, #1265 (emphasis added)).

11

Rather, Plaintiffs allege that the employer's mandates resulted in a single "under-compensation" policy around logging in and logging out. Although the precise details of how the resulting under-compensation arose as to various PCAs may differ, that allegation supports a similarly situated finding.

Second, and relatedly, for the Court to consider at this juncture the individual differences among employees' actions—to which Defendants point—would result in the type of granular analysis that the Sixth Circuit has said courts should avoid in assessing whether employees are similarly situated for FLSA purposes. *Monroe*, 860 F.3d at 403. Even if individual PCAs had different pre- and post-shift practices, the larger allegation is that, regardless of the nuances of a given employee's practices in clocking in or out, Defendants' policy resulted in uncompensated work under the FLSA.[9] As noted, in analyzing a request to facilitate notice under the FLSA, the Court does not reach the more rigorous analysis required under Federal Rule of Civil Procedure 23 for class action certification. *O'Brien*, 575 F.3d at 584–85 (emphasizing a similarly situated finding can exist even where evidence of a defendant's alleged FLSA violation is "individualized and distinct"). The Court is therefore satisfied that, in making its determination, the proper level of generality is the one Plaintiffs suggest—that they engaged in similar methods to comply with Defendants' uniform "under-compensation" policy—not Defendants' view—that discrepancies in the

---

[9] In *Pierce*, the Sixth Circuit confirmed its view that a district court should focus on the plaintiff's "essential claim" when determining whether other employees are similarly situated. *Pierce*, 922 F.3d at 746 ("*Monroe* forecloses [a defendant's] attempt to slice [an allegedly unlawful] policy into so many parts.").

precise methods or times each employee clocked in or out preclude a similarly situated finding.[10]

### c. Other Aspects of PCAs' Job Status Confirm That They Share Similar Employment Settings.

Job status evidence tells much the same story. Plaintiffs highlight that everyone was an hourly, non-exempt employee who worked 40 or more hours per week and received the same training, used similar programming, and were similarly evaluated. (Doc. 35, #443–44). Again, Lott's testimony, the opt-in Plaintiffs' testimonies and declarations, and Representative Powers' testimony support that characterization. (Doc. 35-5, #483–485; Doc. 35-6, #528–31, 542–43; Doc. 35-7 ¶¶ 2–3, 6–9, 15, #569–72; Doc. 35-16, #922–23, 943, 948). This too contributes to a finding that they are similarly situated under *O'Brien*.

True, there may be one wrinkle. All the Plaintiffs left their employment before November 2022, which means that LYP never employed them. (Doc. 29 ¶¶ 22–27, #347–48). That raises a concern that Plaintiffs might not be able to support a request for FLSA notice that extends to those PCAs who LYP employs (or employed). For example, the policies or compensation structure may have changed once Recker created LYP to act as the employer.

---

[10] Defendants' arguments about the time and manner of Plaintiffs' clocking in and out and whether the time-rounding policy favored the relevant Plaintiff or Defendant, (Doc. 37, #1267–68), goes to whether an FLSA violation occurred and the amount of damages to which each Plaintiff may be entitled. These nuances do not, however, impact whether Plaintiffs are similarly situated to other PCAs.

But the Court concludes this does not prevent a similarly situated finding, at least at *Clark*'s first step. As noted, Defendants' 30(b)(6) deposition testimony suggests that Recker created LYP solely for rebranding purposes. (Doc. 35-16, #931). That in turn implies that this change in the precise corporate entity that employed the PCAs (an entity, it should be noted, that was created as a wholly-owned subsidiary of the former employer, (*see id.* at #917)) did not carry with it any alteration in job responsibilities or compensation policies. (*Id.* at #932, 939, 950–53; *see generally* Doc. 35-18 (LYP's Rule 30(b)(6) deposition testimony, in which its operations manager discusses PCAs without distinguishing between Recker and LYP); *compare* Doc. 35-9, #652 (2020–21 Recker employee handbook detailing its rounding policy), *with* Doc. 35-10, #694–95 (2022–23 LYP employee handbook detailing the same rounding policy)). The Court therefore finds that the record supports an inference that LYP PCAs are similarly situated to Lott and the other opt-in Plaintiffs (who had been employed by Recker) and a strong likelihood that the change in corporate structure did not otherwise affect the continuity of operations.

### 2. There Are No Individualized Defenses That Preclude a Similarly Situated Finding.

Now consider *O'Brien*'s second prong—whether individualized defenses exist. Because it appears the PCAs were subject to substantially similar time policies, their claims as to whether those policies violate the FLSA should largely rise or fall as one. That is, the Court is not aware of any individualized defenses that caution against notice. Indeed, the only defense that Defendants raise as standing in the way of court-

approved notice is the statute of limitations. (Doc. 37, #1270–71). But on the facts here that does not preclude notice.

Generally, the FLSA provides for a two-year statute of limitations. 29 U.S.C. § 255(a). If a plaintiff proves a defendant *willfully* violated the FLSA, however, the statute of limitations extends to three years. *Id.* Defendants argue that because Lott resigned from Recker in April 2021, the general statute of limitations required her to file her FLSA claim by April 2023. (Doc. 37, #1270–71). Since she did not, the viability of her claim hinges on whether Recker willfully violated the FLSA. (*Id.* at #1271). And, according to Defendants, Lott's failure to allege facts that support her willfulness claim renders it insufficient, leaving her unable to bring an FLSA suit at all, much less initiate a collective action on behalf of similarly situated workers. (*Id.*).

The Court disagrees. True, *Clark* directs district courts to consider limitations defenses in making findings as to whether employees are similarly situated. *Clark*, 68 F.4th at 1012. But the Court understands *Clark* to require consideration of whether a defendant's limitations defense as to one plaintiff applies in like manner to other employees, such that "collective litigation would yield 'efficient resolution in one proceeding.'" *Id.* (citation omitted). In other words, the Court doesn't resolve the merits of the limitations defense at the initial notice approval stage. Rather, it only determines whether the limitations defense, once its merits are resolved, will likely apply in a uniform manner as to the allegedly similarly situated workers such that it will not interfere with efficient resolution in a single action. *Id.* (explaining that the

"point of the 'similarly situated' inquiry is to determine whether the merits of other-employee claims would be similar to the merits of the original plaintiffs' claims").

How does that play out here? Plaintiffs ask to send notice to former and current PCAs who have worked for Defendants "at any time *during the past three years*." (Doc. 34, #412 (emphasis added)). For statute of limitations purposes, then, there are basically two groups of employees. First are those whose claims fall within the three-year statute of limitations, but not the two-year one, and thus could only proceed if Defendants' violation (if any) is willful (i.e., the "three-year group"). Lott is in this three-year group. Second are those whose claims fall within the general two-year statute of limitations and thus could proceed regardless of Defendants' willfulness (i.e., the "two-year group").

While the issue of willfulness admittedly impacts the two groups differently, the Court concludes that difference does not preclude the action from proceeding as a collective as to both. True, Lott and any other members of the three-year group who join the suit will have an incentive to litigate the willfulness issue. But, so far as the Court can tell, no argument that plaintiffs in the three-year group may press regarding Defendants' willfulness would impact or jeopardize the separate question of whether Defendants violated the FLSA. So, at worst, if the employees in the three-year group cannot prove willfulness, they might drop out of the collective action as a group, but the two-year group could nonetheless proceed (assuming any employees in that group opt in).

Equally important, it does not appear that the willfulness issue here is in any way specific to any individual plaintiff. Rather, Plaintiffs' Third Amended Complaint alleges that it was through Defendants' "uniform policy and practice" that they willfully violated the FLSA. (Doc. 29 ¶ 137, #368). Given that the uniform policy allegedly affected each employee the same way, any willfulness finding would thus apply equally to all opt-in plaintiffs (although the two-year group would not need the benefit of such a finding for statute of limitations purposes). In short, while there is a difference among two groups of potential collective action plaintiffs with regard to the discrete issue of whether Defendants acted willfully such that a given plaintiff's claim can proceed, that difference will not prevent efficient resolution of the overall matter in a single action.

For the same reasons, Defendants' argument about the insufficiency of Lott's allegations regarding willfulness is inapposite where the Court is considering whether to approve initial notice. Rather, as hinted above, that argument goes to the merits and is thus better suited to a motion for summary judgment—a motion not currently before the Court for purposes of this Opinion and Order.[11]

### 3. Fairness and Procedural Concerns Support a Similarly Situated Finding.

Now consider fairness and procedural impacts—the third *O'Brien* prong. Congress authorized the collective action mechanism for FLSA claims to specially vindicate the rights of individuals who may not otherwise have the resources to

---

[11] Defendants have also filed a motion for summary judgment. (Doc. 41). But that motion only recently became ripe, (*see* Doc. 45), so the Court has yet to consider it.

proceed individually. *Hoffman-La Roche*, 493 U.S. at 170. And by consolidating similar claims of allegedly unlawful activity, the judicial system likewise benefits since it can efficiently resolve those claims in one proceeding. *Id.*; *see also Clark*, 68 F.4th at 1012. The request for notice here satisfies both the remedial and efficiency goals of a collective action. Individual PCAs may not know they have a claim for under-compensation under the FLSA, or if they do, the cost of litigating individually likely outweighs the potential benefit. Moreover, Plaintiffs allege that Defendants underpaid "hundreds, if not thousands" of PCAs, (Doc. 29 ¶ 90, #360; Doc. 35, #422), which, if true, would result in significant efficiency gains if litigated in a single action.

Taken together, Plaintiffs have raised questions about Defendants' compensation policy "so serious" as to warrant further investigation. *Stryker*, 60 F.4th at 385. Accordingly, the Court finds that Plaintiffs have shown a strong likelihood that they are similarly situated to other PCAs and will authorize them to provide notice (more on that later) to the other potential plaintiffs.

## B. Defendants' Merits Arguments Do Not Preclude Notice.

Defendants raise two additional arguments. First, they say the two-step verification process, which Defendants employed for security purposes, posed the only barrier to a PCA clocking in or out. (Doc. 37, #1257, 1266). And according to Defendants, time spent verifying one's identity is non-compensable. (*Id.* at #1266). Second, Defendants argue that because their time-rounding policy is "neutral and consistently applied" it is lawful. (*Id.* at #1271–72). Neither persuades the Court that permitting notice is improper.

Start with Defendants' contention that Plaintiffs impermissibly seek compensation for non-compensable time. (*Id.* at #1266). This represents a merits argument the Court should not consider at the notice stage. Before *Clark*, courts generally refrained from considering the merits at the initial-notice stage. *See, e.g.*, *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 214 (S.D. Ohio 2011); *Slaughter v. Lincoln Elec. Co.*, No. 1:18-cv-2705, 2019 WL 4934508, at *7 (N.D. Ohio Oct. 7, 2019). And that practice has continued since *Clark*. *See, e.g.*, *Hogan*, 690 F. Supp. 3d, at 778; *Piddock v. Cmty. Living Network*, No. 22-cv-10715, 2024 WL 2235604, at *2 n.3 (E.D. Mich. May 15, 2024). That is not surprising. While *Clark* clarified and heightened the standard plaintiffs must meet to support a similarly situated finding, *Clark*, 68 F. 4th at 1011 (establishing the "strong likelihood" standard), the Sixth Circuit decision did not, at least as the Court understands it, change the baseline inquiry—that is, whether a plaintiff can show she is similarly situated to other employees such that a collective action would be efficient. *See id.* at 1012. True, *Clark* instructed district courts to "determine whether the merits of other-employee claims would be similar to the merits of the original plaintiffs' claims." *Id.* But the point of examining the merits is to ascertain whether the plaintiff and the employees who would receive notice are similarly situated, not to make conclusions about factual or legal issues. Ultimately, the Court refrains from deciding the compensability of Plaintiffs' activities at this stage.

Now consider Defendants' second claim that Plaintiffs have not established violations of the FLSA or Ohio law since (1) Recker prohibits off-the-clock work, and

(2) its time-rounding policy complies with the FLSA. (Doc. 37, #1268–69, 1271–72). Like compensability of time, these arguments go to whether Defendants violated the FLSA. In fact, Defendants' argument sounds more like those that would support a motion to dismiss. But the sufficiency of the claims is not the question currently before the Court. Rather, the Court must determine whether Plaintiffs have established a strong likelihood that they are similarly situated to other PCAs such that approving notice is proper.

In sum, whether Plaintiffs' activities amount to compensable time and whether Defendants' policies violate the FLSA or Ohio law pertain to the merits of the underlying dispute, not the appropriateness of initial notice. So the Court need not reach these questions here.

## C.    **Opt-In Notice**

Plaintiffs also make various notice-related requests. Specifically, they ask the Court to (1) approve their proposed Notice and Consent, (2) authorize them to send the notice to potential plaintiffs by U.S. Mail, email, and text message, (3) require Defendants to provide them with the names and contact information for all potential plaintiffs who worked for Defendants in the last three years, (4) provide potential plaintiffs sixty days from the notice's mailing date to opt in, and (5) permit them to send one reminder email thirty days after the notice issues to anyone who did not respond. (Doc. 34, #412–13). As Plaintiffs highlight, Defendants object only to the content of Plaintiffs' proposed notice, not the other aspects. (*See* Doc. 40, #10754). The

Court, however, finds it appropriate to address each aspect of the proposed notice and consent in turn.

### 1. Notice and Consent Content

Defendants oppose Plaintiffs' proposed notice's content as "defective in several respects." (Doc. 37, #1272). More specifically, they claim that (1) the two-year (not the three-year) statute of limitations should apply, (2) the proposed notice does not adequately articulate their litigation position, and (3) the proposed notice does not adequately explain the contingency fee arrangement between Plaintiffs and counsel. (*Id.* at #1272 n.6). But "rather than litigating over the wording of the notice," Defendants ask the Court to give the parties time to meet and confer about its content. (*Id.* at #1272–73). Plaintiffs, in their Amended Reply, stated they are "open to" meeting and conferring with Defendants but ask the Court to toll the statute of limitations for the potential plaintiffs "for the period of time that the parties work through the Notice language." (Doc. 40, #10753 n.16). After considering each objection, the Court agrees that the parties should meet and confer about notice, but that tolling is not appropriate.

To assist in the meet and confer process, the Court will rule on Defendants' objections. Start with the first one. The Court has already explained why a three-year notice period is proper—namely, the willfulness determination is not appropriate at this juncture and will not impact the underlying question of whether Defendants violated the FLSA. *See Jones v. Converse Elec., Inc.*, No. 21-cv-1830, 2021 WL

5027411, at *5 (S.D. Ohio Oct. 29, 2021). So it rejects Defendants' objection on that front.

Now consider Defendants' second objection, which claims the proposed notice failed to include their litigation position. The proposed notice states that "Defendants deny Plaintiff's allegations and deny that their Patient Care Associates are entitled to any relief or damages." (Doc. 35-3, #459). Defendants, however, fail to explain why that statement insufficiently describes their litigation position. So the Court is unclear what change to the notice language may be required here, as Defendants do not suggest alternative language. The parties may therefore confer about this language when they meet.

That leaves the last objection—that the proposed notice inadequately explains Plaintiffs' and counsel's contingency arrangement. The notice Plaintiffs propose does state that potential collective action plaintiffs "are not required to pay attorneys' fees or court costs at this time." (*Id.* at #461). It does not, however, explain that potential collective action plaintiffs may be liable for Defendants' litigation costs should they fail to prevail on their claim, which is the type of language Defendants seemingly wish to add. (*See* Doc. 37, #1272 n.6). Because financial responsibility could bear on a potential collective action plaintiff's decision to opt in, Defendants objection on this point is well-taken. *Fenley v. Wood Grp. Mustang, Inc.*, 170 F. Supp. 3d 1063, 1075 (S.D. Ohio 2016). That said, as Defendants did not propose any alterations to the language, the Court thinks it best for the parties to meet and confer in light of the Court's ruling.

Beyond that, after reviewing Plaintiffs' proposed notice and consent, the Court has a few concerns of its own. Plaintiffs' notice suggests that, as an effect of joining the lawsuit, potential collective action plaintiffs' claims will rise or fall with Plaintiff Lott's claims. (Doc. 35-3, #460 (stating that "if Plaintiff wins, [the opt-in plaintiff] may be eligible to share in any monetary award; if Plaintiff loses, no money will be awarded")). But, as described above, Lott is in the three-year group, meaning she could lose (on limitations grounds) even if two-year group opt-ins could prevail.

Even more concerning, the proposed notice says that, by opting in, plaintiffs are "designating the Named Plaintiff as [their] agent to make decisions on [their] behalf in this lawsuit." (*Id.*). The proposed consent, for its part, contains similar language stating that "costs expended by Plaintiffs' counsel" will be deducted on behalf of other opt-in plaintiffs on a pro-rata basis and that "Plaintiffs' counsel will petition the Court" for attorneys' fees. (*Id.* at #463). But all that language rests on a flawed understanding of how FLSA collective actions work. For starters, FLSA collective actions are not representative. *Canaday v. Anthem Cos.*, 9 F.4th 392, 402 (6th Cir. 2021). Rather, once employees opt in, thereby affirmatively choosing to become "party plaintiff[s]," they hold the same status as the plaintiff who initiated the lawsuit. *Id.* (citing 29 U.S.C. § 216(b)); *see also Clark*, 68 F.4th at 1009. And they are free to litigate their claim as they choose. So it does not follow that the outcome of one plaintiff's claim necessarily would dictate the outcome of another plaintiff's claim. And it is certainly not right that the initial plaintiff—here, Lott—can make binding legal decisions on behalf of other plaintiffs regarding their claims, especially

23

when she (presumably) is not an attorney. The Court therefore orders the parties to modify the language in the proposed notice and consent to correct these inaccuracies.

Plaintiffs may be right that absent Defendants' or the Court's reasonable objections, they "should be allowed to use the language of their choice in drafting the notice." (Doc. 35, #445 (citing *Frykenberg v. Captain George's of S.C., LP*, No. 4:19-cv-02971, 2020 WL 5757678, at *4 (D.S.C. Sept. 28, 2020)). But here, Defendants did raise at least one reasonable objection, as did the Court. The Court therefore orders the parties to meet and confer about a notice to the potential plaintiffs and to email any agreed upon notice to Chambers for Court approval by November 20, 2024. If the parties cannot agree, they should email competing notice proposals by November 20, 2024.

Finally, the Court declines Plaintiffs' request to equitably toll the statute of limitations as to the potential collective action plaintiffs while the parties confer about notice. Courts must determine the propriety of equitable tolling—which should be granted sparingly and only under extraordinary circumstances—on a case-by-case basis. *Truitt v. Cnty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998); *Fenley*, 170 F. Supp. 3d at 1076–77. Here, the time that the Court will allow for the meet and confer process is limited (two weeks), and is the type of minimal delay that is inherent in prosecuting a collective action. So these are non-extraordinary circumstances that do not justify equitable tolling.

2.     **Method of Delivery**

Next, Plaintiffs seek approval to send notice to potential collective action plaintiffs via U.S. mail, email, and text message. (Doc. 34, #412). The Court agrees that sending notice via U.S. mail and email will increase the likelihood that potential plaintiffs learn of the lawsuit and their ability to participate, (Doc. 35, #446), which aligns with the trend for notice in this district and nationwide, *Hall v. U.S. Cargo & Courier Serv., LLC*, 299 F. Supp. 3d 888, 899 (S.D. Ohio 2018) (collecting cases). The Court does not agree, however, that it is necessary to send notice also by text message. Indeed, to avoid badgering potential plaintiffs, most courts in this district decline to allow notice via text message unless other methods of notice prove ineffective. *See, e.g.*, *Cowan v. Nationwide Mut. Ins. Co.*, No. 2:19-cv-1225, 2019 WL 4667497, at *11 (S.D. Ohio Sept. 25, 2019) (collecting cases); *Andrews v. Producers Serv. Corp.*, No. 2:19-cv-2514, 2020 WL 4434865, at *5 (S.D. Ohio Aug. 3, 2020); *Hall*, 299 F. Supp. 3d at 899–900. Absent evidence that the combination of U.S. mail and email is insufficient to notify potential plaintiffs of their ability to participate in this lawsuit, the Court limits distribution of notice to those two methods.

3.     **Defendants' Production of Contact Information**

Plaintiffs also request that Defendants provide them a list of all current and former PCAs who work or have worked for Defendants at any of their locations at any time during the past three years, as well as their last known addresses, emails, and telephone numbers. (Doc. 34, #412). Because the Court finds that notice via text message is inappropriate, turning over telephone numbers is unnecessary. *See*

25

*Cowan*, 2019 WL 4667497, at *12. But the Court will order Defendants to produce the names, last known addresses, and last known emails of potential collective action plaintiffs within fourteen days after the Court ultimately approves the updated notice and consent (which the parties should submit within fourteen days of this Opinion and Order).

### 4. Sixty-Day Opt-In Period

Plaintiffs request a sixty-day opt-in period from the date notice is mailed for potential collective action plaintiffs to join the lawsuit if they so choose. (Doc. 34, #413). District courts have significant latitude in determining what notice period is appropriate. *See Ganci v. MBF Inspection Servs., Inc.*, No. 2:15-cv-2959, 2016 WL 5104891, at *2 (S.D. Ohio Sept. 20, 2016). And in this district in particular, courts have routinely approved notice periods of ninety days. *Id.*; *Cowan*, 2019 WL 4667497, at *12 (collecting cases). So the Court concludes that a shorter sixty-day period is appropriate, especially where, as is the case here, Defendants have not objected to the proposed notice period.

### 5. Reminder Notice

Finally, Plaintiffs ask the Court to permit them to send one reminder email thirty days after notice is issued to anyone who did not respond. (Doc. 34, #413). The Court declines to do so. While it is true that notice should advise potential plaintiffs of the existence of a lawsuit, courts must be careful not to encourage those potential plaintiffs to participate. *Hall*, 299 F. Supp. 3d at 900. Sending a reminder notice closely toes that line because, as other courts have recognized, duplicative notice "may

unnecessarily 'stir up litigation' or improperly suggest the Court's endorsement" of the claims. *Hardesty v. Kroger, Co.*, No. 1:16-cv-298, 2016 WL 3906236, at *2 (S.D. Ohio July 19, 2016) (quoting *Hoffmann-La Roche*, 493 U.S. at 168–69). As such, the Court finds that reminder email notice is unwarranted.

### D. The Court Will Not Appoint Counsel for the Potential Plaintiffs.

Finally, in their motion, Plaintiffs also ask the Court to "[a]ppoint[] the undersigned counsel as counsel for the [potential plaintiffs]." (Doc. 34, #413). The Court declines that request for the simple reason that the Court lacks power to consider it. Section 216(b) collective actions do not imitate Rule 23 class actions when it comes to appointing counsel. As noted, if a similarly situated employee elects to opt into an FLSA collective action, he joins the action as a party "with the same status in relation to the claims of the lawsuit as do the named plaintiffs." *Clark*, 68 F.4th at 1009 (cleaned up). And he can therefore retain counsel of his choosing. *Hall*, 299 F. Supp. 3d at 898; *Fenley*, 170 F. Supp. 3d at 1073.

By contrast, Rule 23 requires courts to appoint counsel when they certify a class, but that is because the action is representative in nature. *See Clark*, 68 F.4th at 1009. In that way (and others), class actions are "fundamentally different" from FLSA collective actions. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013); *see also Gilstrap v. Sushinati LLC*, __ F.Supp.3d __, 2024 WL 2197824, at *7 (S.D. Ohio 2024) (explaining the irreconcilable differences between FLSA collective actions and Rule 23 class actions).

With those differences in mind, the Court rejects Plaintiffs' request to appoint their counsel as counsel for the potential opt-in plaintiffs. To the contrary, the parties should include language in their proposed notice and consent specifically informing potential plaintiffs of their right not only to opt in, but also to choose their own counsel.[12]

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Court-Authorized Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b) (Doc. 34). The Court **ORDERS** the parties to confer about notice and consent to the potential plaintiffs and to email any agreed upon notice and consent proposal (or competing proposals) to Chambers by November 20, 2024. Further, the Court **ORDERS** the parties to include language about potential plaintiffs' right to choose their own counsel in the proposed notice and consent. Finally, the Court **ORDERS** opt-in Plaintiffs Parker, Hall, Jamison, and Watkins to respond to Defendants discovery requests by November 27, 2024.

**SO ORDERED.**

November 6, 2024
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[12] Plaintiffs proposed consent, for example, requires potential plaintiffs to "hereby designate the Sommers Schwartz, P.C. law firm to represent [them] in this lawsuit." (Doc. 35-3, #463). That seemingly requires potential plaintiffs to opt in without having the chance to select their own attorney should they so choose. For the reasons described, the Court finds such language problematic.