## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**KIARA LOTT, et al.,**

       **Plaintiffs,**

            **Case No. 1:23-cv-489**

    **v.**

            **JUDGE DOUGLAS R. COLE**

**RECKER CONSULTING, LLC, et al.,**

       **Defendants.**

### OPINION AND ORDER

This case requires the Court to determine when the workday starts and ends under the Fair Labor Standards Act (FLSA) for an employee who works from home through computer-based activities. Does it start when she makes a cup of coffee? Is it when she sits down where she plans to work? Is it when she turns on her computer? Or is it the first email she sends or first task she undertakes? Does it end when she shuts down her computer? Or is it when she walks out of the room? These issues present line-drawing problems, largely of first impression. In the physical-work world, by contrast, courts have defined those lines fairly well under interpretations of the FLSA and associated Department of Labor regulations. But for remote-work environments, courts are just starting to wrestle with these interpretive questions.

The cast of characters compelling the Court to answer these novel questions here consists of Plaintiff Kiara Lott, who first initiated this FLSA action, (Compl.,

Doc. 1, #4), and the 130 opt-in Plaintiffs who have since joined this collective action,[1] (*see* 6/3/25 Min. Entry), all of whom either worked or work as Patient Care Associates (PCAs) for the last two characters here—Defendants Recker Consulting, LLC, and LYP Contact Center, LLC,[2] (Order, Doc. 47, #10963–64). Presently, Recker and LYP seek summary judgment as to all of Plaintiffs' claims. For the reasons described below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 41).

## BACKGROUND[3]

### A.    Recker and LYP Provide Call-Center Services for Healthcare Providers.

Recker is a holding company. LYP is (or was[4]) one of the companies in the Recker stable. (Powers Dep., Doc. 35-16, #918). Until November 2022, Recker directly

---

[1] As previously explained, while the docket lists Kiara Lott as *the* Plaintiff, each opt-in Plaintiff has since filed such a consent to join under 29 U.S.C. § 216(b). (Docs. 7, 8, 33, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67). The Court discusses the current status of those opt-ins below. *See* Law and Analysis, Part A.

[2] As explained below, Recker employed the PCAs until November 2022; LYP employed them after that time. (Powers Dep., Doc. 35-16, #917–18, 931–32).

[3] In recounting the case's factual background on a motion for summary judgment, the Court normally relies on the parties' stipulated undisputed facts, submitted as part of their briefing as directed by Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. Here, the parties decided to forgo compliance with that Order. That leaves the Court to piece together the background of this case as best as it can. The Court **ADMONISHES** the parties and **ORDERS** them to comply with this Court's Standing Orders moving forward. The Court also reminds Plaintiff of Standing Order I.F.1.d., *id.*, concerning compliant fonts. Finally, the Court reminds both parties that allegations in the operative complaint do not constitute valid record evidence for summary-judgment purposes. Rather, as Standing Order I.F.2.a explains, proposed facts should be supported by specific citations to: "(1) the affidavit or declaration of a witness competent to testify as to the facts at trial; (2) a deposition; and/or (3) other evidence, including documentary evidence, that would be admissible at trial." *See also* Fed. R. Civ. P. 56(c).

[4] Recker recently sold a controlling interest in LYP to another company. (Montgomery Dep., 35-23, #1166; Doc. 41, #10758).

employed the PCAs. (*Id.* at #917–18, 931–32). But after a corporate rebranding effort that made LYP a wholly-owned subsidiary, LYP took over employing the PCAs. (*Id.*). Defendants provide (or provided, in the case of Recker) a call-center service for third-party healthcare providers. (*Id.* at #918; Lott Dep., Doc. 35-5, #470–71). Recker's (and then LYP's) stated goal, at one point at least, was to "[e]mpower[] US healthcare providers with innovative technology solutions that free them to focus on patient care." (New Hire Orientation Presentation, Doc. 35-19, #1086). In line with that goal, Defendants served various healthcare clients—from oncology to behavioral health to orthopedic providers, to name just a few—across multiple states. (*See* Doc. 35-5, #471; Barron Dep., Doc. 35-18, #1027–29).

## B.   Patient Care Associates' Responsibilities.

Employees who are Patient Care Associates served on "the front line" of providing Defendants' services. (Doc. 35-19, #1097; *see also* 35-5, #470–71). Those services, in turn, centered around Defendants' clients' patients. Along those lines, all agree that PCAs' primary job duty or "main function" was to answer "inbound calls from clients' patients." (Doc. 35-16, #922, 931, 939–40; Doc. 38-18, #1029; Resp., Doc. 42, #10783; *see also* Doc. 35-5, #470–71; Butler Dep., Doc. 35-6, #526). And while fielding those calls, PCAs generally handled various requests—often responding to patients' inquiries or transferring their calls to the appropriate medical departments. (Doc. 35-5, # 470–72; Doc. 35-6, # 526; Parker Decl., Doc. 35-7, #570–71;[5] Doc. 35-18,

---

[5] Defendants forcefully argue that the Court should disregard Plaintiff Parker's declaration in toto. (Reply, Doc. 45, #10927–28). Courts do not make credibility determinations when deciding motions for summary judgment. *Cinnamon Ridge Condo. Ass'n, Inc. v. State Farm*

#1048; Doc. 35-16, #939). For example, Lott would "address calls for medication refills, after-hours calls for emergenc[ies,] … calls for directions to the location, or how to get to the actual doctor's office[, and questions] about COVID testing [or] vaccinations." (Doc. 35-5, #471). Similarly, opt-in Plaintiff Butler would assist patients in scheduling appointments, provide information on test results, or facilitate the patient-doctor, question-answer process. (Doc. 35-6, #526).

Each PCA was assigned at any given time to a single client team. (*See e.g.*, Doc. 35-5, #471). So to the extent that the daily tasks PCAs performed or the computer applications they utilized varied among PCAs, those differences were likely attributable to unique needs and processes of the given client to whom that PCA was assigned. (*Compare id.* at #471–72 (Lott explaining she did not handle scheduling or access patients' medical records), *with* Doc. 35-6, #526–27 (Butler explaining she handled scheduling and worked with patients' medical records); *see also* Doc. 35-16, #938 (describing client-specific trainings); Doc. 35-18, #1022–23 (discussing how different clients used different electronic-medical-record systems (EMRs))). For example, the demands of an oncology provider may differ from those of a behavioral-health provider. (*See* Doc. 35-18, #1023, 1027). Despite the differences, Defendants' software (which they called a "workflow system") would guide PCAs on how to handle

---

*Fire & Cas. Co.*, 734 F. Supp. 3d 744, 749 (S.D. Ohio 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But as Defendants point out, there are several inconsistencies with Parker's declaration and the deposition testimony offered by Plaintiffs Lott and Butler. Given that Parker previously refused to find time for a deposition (which prompted the Court to order him to do so, (*see* 6/24/25 Min. Entry)), the Court cites to Mr. Parker's declaration only in instances where he's offered statements consistent with the other two PCAs.

each call. (Doc. 35-5, #488; Doc. 35-6, #530–31; Doc. 35-16, #941 (describing how the workflow systems were adjusted for each client); Doc. 35-18, #1048).

While Plaintiffs (each of whom is or was a PCA) handled calls from patients on the "front line," they engaged in those activities from the comfort of their own homes. During the relevant time, PCAs all worked remotely, rather than in physical call centers.[6] (Doc. 35-16, #925; *see also e.g.*, Lott Dep., Doc. 35-5, #472–73). But, while they worked from home, Defendants provided them with the equipment needed to do so—a laptop, multiple monitors, keyboard, mouse, and docking station. (Doc. 35-5, #475; Doc. 35-6, #530).

Of course, a computer on its own is of limited utility. It is the various applications housed on the computer that make it useful. On that front, the number of computer programs PCAs actually used on a day-to-day basis to perform their job was relatively small. Lott used the phone system,[7] Defendants' workflow system, a telephone directory database, Google Maps, and Microsoft Teams. (*See* Doc. 35-5, #481–84, 488). Butler similarly reported that she used the phone system, Epic (an electronic medical records (EMR) system), Defendants' workflow system, Google, Microsoft Outlook, and Microsoft Teams in responding to callers. (Doc. 35-6, #530;

---

[6] Previously, the Court noted that Plaintiffs worked at Recker's brick-and-mortar call center. (Doc. 46, #10935; *see also* 4th Am. Compl., Doc. 70, #11164–65 (alleging that several opt-in Plaintiffs worked at the brick-and-mortar call center)). But as of August 2020 (the starting point for this lawsuit), all PCAs worked remotely, as they do today. (Doc. 35-16, #925; Doc. 35-23, #1138). One exception was for trainings, which were sometimes held in person. (Doc. 35-6, #528; Doc. 35-16, #925, 943). Now, those trainings are done virtually as well. (Doc. 35-18, #1036).

[7] The phone system and/or workflow system has gone by many names, (*see* Def.'s Objs. & Resps. to Pls.' First Set of Interrogs., Doc. 35-24, #1211), so the Court refers to both generally.

Doc. 35-18, #1023). Opt-in Plaintiff Parker used essentially the same applications as Butler. (Doc. 35-7, #572).

PCAs were hourly, non-exempt employees who were expected to work forty hours per week. (2020–21 Emp. Handbook, Doc. 35-9, #648; 2022–23 Emp. Handbook, Doc. 35-10, #690).[8] That included eight-hour shifts with two fifteen-minute paid breaks, along with an unpaid thirty-minute meal break. (Doc. 35-9, #648–49; Doc. 35-10, #690–91). In other words, each PCA was scheduled for eight-and-a-half hours (including the unpaid meal break), five days a week. They were permitted to work overtime only with prior authorization from their managers. (Doc. 35-9, #631; Doc. 35-10, #673; Doc. 35-16, #956). They received the same training, used similar programming, and were similarly evaluated. (Doc. 46, #10947).

## C.    PCAs' Pre-shift, Meal Break, and Post-shift Activities.

### 1.    Starting the Day.

Defendants required PCAs to be in a "call-ready" state at the start of their shift and at the end of the unpaid meal break. (Doc. 35-5, #490; Doc. 35-6, #536, 542–43; Doc. 35-18, #1023–24; *see also* Doc. 35-9, #650 ("Employees shall be at their workstation, ready to begin work at the start of their scheduled work time or resumption of work duties."); Doc 35-10, #692 (same)). More on the actual policy shortly. But for present purposes, PCAs interpreted it to mean being "available on the phone to take whatever calls are coming through" and having all of the

---

[8] Because the relevant time period for this lawsuit starts in 2020, the Court cites only to the employee handbooks post-dating 2020.

applications they needed to respond to those calls up and running by their shift start time. (Doc. 35-6, #542–43; Doc. 35-18, #1024).

But getting to that call-ready state involved the PCAs undertaking various other activities first. For example, Lott would start the day by turning on and logging into her computer (i.e., entering a username and password), and then also dual-authenticating through the Duo Security platform.[9] (Doc. 35-5, #489, 493–94). Once she completed that process, she also had to open: (1) her timekeeping program (which also required login information), (2) Microsoft Teams, (3) a telephone directory database, (4) the app-based phone system, and (5) Google Maps.[10] (*Id.*). But Lott could open those programs in any order.

The shift "started" for a given PCA when that PCA "clocked in," which was accomplished by accessing the timekeeping program (supplied by ADP), either through a website on a computer or on a smartphone application. (*Id.* at #489). Lott says that some days she clocked in before opening up the various programs mentioned above; other days she clocked in after opening some or all of them. (*See id.* at #489–90). But Defendants' records establish that a vast majority of the time (to the tune of over 95% of the time), she clocked in before entering at least the phone system. (*Id.* at #490–91; Nenni Decl., Doc. 37-3, #1498). Butler followed a generally similar process, but the first thing she did immediately after booting up her computer and

---

[9] Duo Security is a third-party company uninvolved with this lawsuit. The same goes for common applications of and websites associated with Google, Microsoft, and ADP.

[10] Lott used Google Maps to instruct any patients calling for directions because she was not physically located near the healthcare provider that she serviced. (Doc. 35-5, #482).

logging in (which included Duo dual-authentication) was to clock in through the ADP website. (Doc. 35-6, #536–37). She says that it would take her five to ten minutes "at most" to access the timekeeping website.[11] (*Id.* at #538). After clocking in, Butler would proceed to activate a virtual private network (VPN) program[12] and all the applications she worked in throughout the day, like the phone system, workflow software, Epic, and Google. (*Id.* at #528–29, 536–37). Defendants' records confirm that the majority of the time, Butler, like Lott, clocked in before activating the phone system. (*Id.* at #538; Doc. 37-3, #1574).

What lies at the heart of this suit is Defendants' view that everything PCAs do before they are "ready to be able to start taking phone calls" is noncompensable time. (Doc. 35-16, #923). Plaintiffs disagree with that view. (4th Am. Compl., Doc. 70, #11169–71).[13] Beyond that, Defendants contend that, in practice, they baked in a

---

[11] Defendants insist, relying on data from a single PCA, on just two days (in other words, two instances of logging in), that the time it takes PCAs to get from boot up, log in, and dual-authentication push-notification to the phone system is "brief." (Doc. 41, #10760–61; *see also* Doc. 37-3, #1619). For the five other days for which they provide data, but that don't fit this narrative, Defendants speculate that the PCA may have been "getting coffee" or engaging in other non-work activities. (Doc. 41, #10760). But there are other plausible reasons for the time gaps those records reflect in the chain of events needed to become call-ready. (*See* Doc. 37-3, #1619). For example, the computer, or a given application, may have required an update, or the PCA could have been having technical difficulties. Given the paucity of the record evidence on this issue, and that fact that Plaintiffs dispute the assertion that the time required to go from starting the computer to call-ready is brief, (Doc. 42, #10784 n.2), the Court does not rely on that characterization here.

[12] A VPN is a program used to establish a secure datalink between a user's computer and another device or devices accessed through the internet. Data that travels through a VPN is encrypted from endpoint to endpoint. Butler's use of a VPN potentially may have been a client-specific requirement. It's unclear from the record whether all PCAs used a VPN.

[13] At the time Defendants filed their motion for summary judgment, the Third Amended Complaint was the operative complaint. (Doc. 29). Since the filing of the motion, however, Plaintiffs filed a Fourth Amended Complaint. (Doc. 70). The Court has reviewed the updates

8

grace period to the call-ready policy. (Doc. 35-18, #1023–25, 1040–42; *see also* Doc. 35-16, #949–50 (explaining this policy as "setting the expectation of punctuality," rather than serving as a basis for disciplinary action)). That is, according to Defendants, the call-ready policy was, in practice, a you-should-get-call-ready-immediately-at-the-start-of-your-shift policy. (*See* Doc. 35-18, #1024–25). It seems that PCAs were hearing and reading conflicting messages on that front though. Orally, they were instructed not to do anything before their shift start time. (*Id.* at #1025 ("[W]e don't want folks, and we don't advise folks to do anything prior to the start of their shift.")). But most did so anyway. And the desire to be completely ready to go at the beginning of the shift, rather than using the beginning of the shift to complete getting ready, is also consistent with the written policy's directives. (Doc. 35-9, #650 ("Tardiness occurs when an employee is not present, and ready to begin working, at his/her workstation, (signed into [the phone system]) past their scheduled time."); Doc 35-10, #692 ("Tardiness occurs when an employee is not present, and ready to begin working, at his/her workstation and signed into all job-related software past their scheduled time.")). So, as explained above, in the process of getting call-ready, PCAs would start up and log into their computers, then open all the programs or applications they needed to take such calls.

---

to the now-operative complaint, and since there are no substantial alterations to the allegations, the Court will cite to it in this Opinion and Order.

## 2. Taking Meal Breaks.

As noted, Defendants provided PCAs with an unpaid thirty-minute daily meal break and required PCAs to clock out before, and clock in after, that break. (Doc. 35-9, #652; Doc. 35-10, #694). But the PCAs claim that Defendants also required them to take actions that ate into their lunch. (Doc. 70, #11170, 11174–75). Once again, this argument rests on the call-ready policy. The PCAs claim that they had to return early from their breaks to comply. (*Id*.). To see the factual basis for that contention, consider Lott's and Butler's approach to their meal breaks.

When it was time for lunch, Lott would change her status in the phone system to unavailable ("so that calls would not generate"), let her team lead know she was taking her lunch break on Microsoft Teams, clock out on the time program on the ADP website, then leave her computer—she says after five minutes the computer automatically locked. (Doc. 35-5, #483–84). After taking her break, she would wake up her computer screen, enter her username and password, dual-authenticate through a Duo push notification, clock in on her timekeeping program, and change her status to available in the phone system. (*Id*. at #485, 490). She says that process of re-entering her system took around five minutes. (*Id*. at #490). Butler's description of the process is generally similar—she says it took ten minutes "at most," but could take less than a minute at times. (Doc. 35-6, #538–40). But those minutes, they say, added up. And they argue Defendants owe them for that time, too.

10

### 3. Ending the Day.

Finally, Plaintiffs also allege they were uncompensated for time spent shutting down their computers. (Doc. 70, #11175). To end her day, Lott would finish her last call, notify her team lead she was leaving for the day on Microsoft Teams, exit out of the phone system, clock out on the timekeeping program, close other programs and applications (e.g., a client directory, Googe Maps), then shut down her computer. (Doc. 35-5, #481–82). She estimates that whole process took about five minutes. (*Id.* at #482). As for Butler, she would close out of her applications (e.g., phone system, Epic), clock out, then shut down her computer. (Doc. 35-6, #534–35). She estimated this process took five to ten minutes. (*Id.* at #535). Again, Plaintiffs say that these few extra minutes after clocking out added up over time. (*See* Doc. 70, #11175)

Defendants never had a company policy requiring PCAs to shut down their computer at the end of every day. (Montgomery Dep., Doc. 35-23, #1166–68). In fact, Defendants say there were three ways PCAs could leave their computers at the end of a shift (which, in turn, would impact the speed of the boot-up process on the following workday). They could (1) simply lock their computer screen (resulting in the shortest start-up process the next shift); (2) restart their computer; or (3) shut down their computer (resulting in the longest start-up process the next shift). (*See* Montgomery Decl., Doc. 37-2, #1485–86). Despite these options, the common practice appears to have been to shut down the computer—and this practice may have been encouraged by PCAs' supervisors. (Doc. 35-5, #481–82; Doc. 35-6, #532, 535–36).

11

**D.      Defendants' Timekeeping and Attendance Policies.**

Over the years, Defendants have used multiple timekeeping systems that PCAs utilized at shift-starts, shift-ends, and meal breaks. (Doc. 35-16, #927–28). But the general policy for PCAs remained the same—they were "required to use the time clock system to record their hours worked." (Doc. 35-9, #652; Doc. 35-10, #694). *How* could PCAs clock in and out? Either on their computer or on their personal phone, (Doc. 35-16, #937; Powers Decl., Doc. 37-1, #1277), although all indications are that PCAs primarily used their computers to do so, (Doc. 35-5, #474; Doc. 35-6, #529–30). (*But see* Doc. 37-3, #1619 (indicating that opt-in Plaintiff Jamison used the mobile login option at times)).

*When* exactly PCAs were to clock in and out was trickier. Under the 2020–21 Handbook, employees were told they "should clock in no sooner than ten (10) minutes before the[ir] schedule[d] shift and clock out no later than seven minutes (7) after the[ir] scheduled shift unless otherwise specified by their manager." (Doc. 35-9, #652). In the 2022–23 Handbook, the clock-in window got shortened to five minutes, but the seven-minute clock-out window remained the same. (Doc. 35-10, #694). And while those instructions could be read as advisory to some extent (i.e., the use of the word "should"), just a few paragraphs below that instruction, PCAs were warned that they were "not permitted to work overtime without prior authorization." (Doc. 35-9, #652). And Defendants included "clocking in early, clocking out late or working through the scheduled lunch period" as overtime. (*Id.*). To put some additional oomph behind that directive, the policy advised that while PCAs would be paid for unauthorized overtime, it could result in "disciplinary action up to and including termination." (*Id.*).

Related to the timekeeping policies, as discussed above, there is at least some suggestion in the record that Defendants expected PCAs to be call-ready at the start of their shift (which is not the same as merely clocking in). (Doc. 35-9, #650; Doc 35-10, #692). And many of Defendants' attendance polices seem to speak directly to this expectation. For example, the handbook that Defendants provided to PCAs explained that "[i]f employees are not prepared, they will be considered tardy." (Doc. 35-9, #650; Doc. 35-10, #692). And "[e]xcessive tardiness, whether excused or unexcused, constitutes unacceptable work performance." (*Id.*). In the 2020–21 Handbook, tardiness was explained as including situations when "an employee is not present, and ready to begin working, at his/her workstation, (signed into [the phone system]) past their scheduled time." (Doc. 35-9, #650). It proceeded to give an example: "8:00 is permissible, 8:03 is tardy." (*Id.*). But in the 2022–23 Handbook, it appears the grace period that Defendants alluded to, (*see* Doc. 35-18, #1023–25, 1040–41)—the notion that the call-ready policy was actually a use-the-beginning-of-your-shift-to-get-call-ready policy—in fact became actual company policy. The handbook excised the 8:03 example and replaced it with: "Associates are allowed a 5-minute grace period to allow for systems to come up, however, this should only be used occasionally." (Doc. 35-10, #692). But in some ways, this updated policy was actually less forgiving. Defendants broadened the definition of tardiness, such that PCAs not only needed to be signed into the phone system, but also to have loaded "all job-related software" by their scheduled shift time to avoid a tardy designation. (*Id.*).

13

The handbooks then went on to outline a complicated points-based system for disciplining tardiness and enforcing the attendance policy (although the 2022–23 system seemed more simplified). (Doc. 35-9, #651–52; Doc. 35-10, #693–94). The long-and-short was that, if a PCA was tardy enough times, during a short-enough span, they could receive discipline.[14] (*Id.*).

## E. Defendants' Time-Rounding Policy and Its Impact on PCAs' Compensation.

One last policy deserves mention—Defendants' time-rounding policy. Defendants' policy rounded clock-in and clock-out times either up or down to the nearest quarter-hour increment. (Doc. 35-9, #652; Doc. 35-10, #694–95). In other words, the timekeeping system only recognized quarter-hour increments. It recorded a worker as starting, for example, either at 8:45 a.m. or at 9:00 a.m.; nothing in between. (*See id.*). Seven minutes or less was rounded down; eight minutes or more was rounded up. So for example, if a PCA with a shift-start time of 9:00 a.m. actually clocked in at 8:53 a.m. (or later),[15] their start time would be rounded to 9:00 a.m. (and they would not be paid for those seven pre-shift minutes). Conversely, if that same

---

[14] For the 2020–21 policy, "[c]orrective action" could include "coaching, verbal counseling, written warning, performance improvement plan and/or termination in any order or combination." (Doc. 35-9, #651). Defendants reserved the right to "discipline in the manner and with the form of discipline it so choices [sic] and at its sole discretion." (*Id.*). The 2022–23 policy seemed a bit more forgiving, prioritizing "Performance Incentive Plan[s]" "to correct attendance issues." (Doc. 35-10, #693). Nonetheless, if a PCA failed to follow the requirements of that improvement plan, it could "lead to additional disciplinary actions including up to termination." (*Id.*).

[15] Of course, clocking in seven or six minutes would run afoul of Defendants' 2022–23 clock-in policy. (*See* Doc. 35-10, #694 ("Employees should clock in no sooner than five (5) minutes before the[ir] schedule[d] shift.")).

14

PCA clocked in at 8:52 a.m.,[16] the PCA would be treated as starting at 8:45 a.m., and would be paid for that additional quarter-hour increment. Or consider how it plays out with a late-arriving PCA. If a PCA clocked in seven minutes late, say at 9:07 a.m., that PCA would be treated as clocking in at 9:00 a.m., and thus paid for seven minutes not worked. But if they "arrived" at 9:08 a.m., they would not be paid for the time between 9:08 a.m. and 9:15 a.m.

Similar examples apply to the end-of-day, clock-out process. Imagine a PCA with a shift-end time of 5:00 p.m., but who answered a call at 4:58 p.m. that lasted until 5:05 p.m., with the PCA then clocking out at 5:07 p.m. In that scenario, Defendants' rounding policy would not compensate the PCA for those seven minutes. But if the call had lasted a little longer, resulting in a 5:08 p.m. clock out, the PCA would be paid for a few minutes (from 5:08 to 5:15 p.m.) that they did not work. The examples abound.

So how have those policies worked out in practice? Does the rounding policy systematically favor either PCAs or Recker and LYP? It's a little hard to say, as Defendants apparently never conducted any analyses to determine whether their rounding policies worked to their benefit or the PCAs' benefit. (Doc. 35-16, #964). But, as a result of this litigation, they have now done at least some research on that front. Specifically, Defendants analyzed the effects on Lott and five of the opt-in Plaintiffs. Perhaps unsurprisingly in light of the description above, "the policy sometimes favored Recker [] and sometimes favored" PCAs. (Doc. 41, #10770). As to four of the

---

[16] Again, this would violate Defendants' clock-in policy (under either the 2020–21 or 2022–23 policy). (*See* Doc. 35-9, #652; Doc. 35-10, #694). *See also supra* note 15.

six PCAs, it appears to have favored Defendants, while it overall worked to the benefit of the other two PCAs.

| PCA | # Shifts Worked | Approximate Rounding-Policy Impact Per Shift | Approximate Amount at Issue for Relevant Employment Period |
|---|---|---|---|
| **Lott** | 119 | 2.02 minutes favoring Defendants | $60.01 in favor of Defendants |
| **Hall** | 17 | 1.53 minutes favoring PCA | $6.50 in favor of PCA |
| **Butler** | 28 | 1.79 minutes favoring Defendants | $12.53 in favor of Defendants |
| **Parker** | 85 | 0.73 minutes favoring Defendants | $15.51 in favor of Defendants |
| **Watkins** | 380 | 0.88 minutes favoring Defendants | $88.62 in favor of Defendants |
| **Jamison** | 280 | 0.48 minutes favoring PCA | $33.60 in favor of PCA |

(*Id.*; Doc. 37-3, #1498, 1515, 1528, 1574, 1579, 1585).

## F.   Contract, or Not?

While Plaintiffs allege that Defendants' practices and policies violated the FLSA and Ohio labor laws, they seek to hold Recker and LYP liable under contract theories as well. (Doc. 70, #11187–90). On that front, Plaintiffs claim that "Defendants had [] binding and valid contract[s] with Plaintiff[s]" as evidenced by "letters offering employment, pay statements, … other documentary evidence[, and] verbal offers." (*Id.* at #11187). There is some testimony that suggests offer letters exist. (*See* Doc. 35-6, #533; Doc. 35-16, #929, 935). But no party has yet submitted any such offer letter to the Court.

Instead, Defendants point to language in the employee handbooks provided to Plaintiffs and argue that such language suffices to show that no such contracts existed. (Doc. 41, #10771–72). Defendants highlight two passages in particular. First, a provision that says:

> There is no implied employment contract created by this Handbook or any other Company document or written or verbal statement or policy.

(Doc. 35-9, #624; Doc. 35-10, #666). And second, the acknowledgement page, which the employee is to sign, and which includes the following:

> It is specifically understood and agreed that the Handbook is for informational purposes only and is not intended to create a contract, nor is it a contract of employment or continuing employment between myself and the Company.

(Doc. 35-9, #659; Doc. 35-10, #701). This language was included in every opt-in Plaintiff's handbook that has been submitted to the Court so far, and as far as the Court can tell, all the employees signed the signature page acknowledging receipt of the handbook. (*See, e.g.*, Lott Handbook, Doc. 35-11, #708, 743; Butler Handbook, Doc. 35-12, #750, 785–86; Parker Handbook, Doc. 35-13, #793, 828; Jamison Handbook, Doc. 35-14, #835, 870; Hall Handbook, Doc. 35-15, #877, 912–13).

## G. Procedural History.

Apart from the background facts underlying this dispute, the Court also briefly recounts how we got here from a procedural standpoint. On August 1, 2023, Lott initiated this case as both a collective action under 29 U.S.C. § 216(b) and a putative class action under Federal Rule of Civil Procedure 23. (Doc. 1, #1). Since that time, 130 opt-in Plaintiffs have filed consents to join. *See supra* note 1. The Court has not yet determined whether the opt ins are "actually" similarly situated—that comes

17

later. *See Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1010 (6th Cir. 2023). And Plaintiffs have not yet moved to certify a class.

Plaintiffs are on their Fourth Amended Complaint, but the allegations have largely stayed the same. (Doc. 70). Plaintiffs allege that Defendants violated the FLSA and related Ohio laws by failing to pay them for time they worked booting up and logging into their computers at the start of the day, booting up and logging in after their meal break, and shutting down their computer at the end of the day. (*Id.* at #11171, 11183–87). They also allege that Defendants' time-rounding policy, described above, is unlawful under the FLSA because it violates 29 C.F.R. § 785.48(b). (*Id.* at #11167–70, 11184–85). Plaintiffs also advance breach-of-contract and unjust-enrichment theories for the same alleged underpayments. (*Id.* at #11187–90).[17] Because PCAs worked forty-hour weeks, Plaintiffs seek overtime pay for these alleged violations under 29 U.S.C. § 207 and Ohio Revised Code § 4111.03.[18] (*Id.* at #11183–87).

At the time Recker and LYP filed the motion for summary judgment now before the Court, the parties had completed discovery only as related to the opt-in notice and consent issue, (*see* 10/31/23 Min. Entry), which the parties completed on April 22, 2024, (*see* 2/15/24 Not. Order). After that limited-discovery process, the Court granted

---

[17] Again, to be clear, Plaintiffs allege that Recker violated these policies before November 22, 2022, and that LYP violated them after November 22, 2022, because Recker employed the PCAs before that date, and LYP employed the PCAs after that date. (Doc. 70, #11161). *See supra* note 2.

[18] In weeks when a PCA may not have worked forty hours, Plaintiffs seek "gap time," which should be paid at the regular hourly rate (versus one and one-half for overtime). (Doc. 70, #11175–76, 11184).

Plaintiffs' request to send court-authorized notice to potential opt-in plaintiffs.[19] (Op. & Order, Doc. 46). Merits discovery has only recently kicked off. (*See* Calendar Order, Doc. 69).

Recker and LYP now press several arguments in support of summary judgment.[20] As to Plaintiffs' off-the-clock-work claims, they argue that (1) the actions PCAs took during pre-shift, meal breaks, and post-shift are not compensable activities, and (2) even if those activities were compensable, the associated time is de minimis, so Defendants were free to disregard it. (Doc. 41, #10765–68). For the rounding-policy claims, Recker and LYP claim their policy was legally permissible since it was neutral as written and in application. (*Id.* at #10768–71). Finally, Defendants argue that Plaintiffs' breach-of-contract and unjust-enrichment claims must fail because Plaintiffs' employee handbooks, which they signed to acknowledge receipt, disclaimed formation of any such contract. (*Id.* at #10771–72; *see, e.g.*, Doc. 35-11, #708, 743 (Lott's signature)).

While there appears to be some factual disputes between the parties—for example, approximately how long certain activities took PCAs to complete—they

---

[19] The Court, however, took issue with aspects of Plaintiffs' proposed notice and consent form, (*see* Doc. 46, #10954–62), and ordered the parties to meet and confer before submitting a revised form to the Court. The parties needed the Court's help resolving a few disagreements, (*see* 11/26/24 Min. Entry), but the Court eventually approved the parties' jointly submitted notice and consent forms on December 9, 2024. (Order, Doc. 47, #10963–64).

[20] Separately, Recker and LYP ask the Court to dismiss Plaintiffs Hall, Jamison, and Watkins for failure to participate in the discovery process. (Doc. 41, #10773). The Court already addressed this issue in its previous Opinion and Order. (Doc. 46, #10941–42 n.8). So the Court **DENIES AS MOOT** Defendants' motion to the extent it seeks dismissal against Hall, Jamison, and Watkins. But to the extent that those Plaintiffs did not comply with the Court's previous order, the Court is amenable to a renewed motion to dismiss for failure to prosecute.

appear to agree on PCAs' job duties, the applications and systems PCAs used, and the policies at issue. Plaintiffs agree that a summary-judgment decision is appropriate on two questions: "(1) What activity begins Plaintiff[s'] compensable workday; and (2) What activity ends Plaintiff[s'] compensable workday." (Doc. 42, #10793). Defendants frame that inquiry slightly differently: "Does the law require [Defendants] to compensate remote [PCAs] for time spent passing through security protocols and digital doors when entering and exiting the digital, secure workplace (i.e., their computers)?" (Reply, Doc. 45, #10918). Defendants also urge the Court to find that their rounding policy was neutral. (*Id.*).

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that (1) there is no genuine dispute as to any material fact, and (2) they are entitled to judgment as a matter of law, as to one or more claims or issues. Fed. R. Civ. P. 56(a). The first part of the summary-judgment standard focuses on the factual record: the movant bears the burden of pointing to specific evidence in the record to show the absence of a genuine dispute of material fact (or, if it is an issue on which the non-movant bears the burden at trial, the lack of any evidence that would allow the non-movant to meet that burden). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The second part of the standard requires the movant to show that the facts (or lack of facts) identified at the first step entitles the movant to judgment as a matter of law. *See id.* at 323. In measuring the movant's arguments against that standard, "the Court must view the evidence in the light most favorable to the non-moving party." *Saint Vil v. Blue Ash*

*Healthcare, LLC*, No. 1:23-cv-85, 2024 WL 3373312, at *3 (S.D. Ohio July 9, 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). But if the movant carries its burden, then summary judgment is appropriate unless the nonmovant can "present some sufficient disagreement" through citations to facts in the record "that would warrant submitting the dispute to a jury." *Id.* (cleaned up).

So here because the non-movants (Kiara Lott and the opt-in Plaintiffs) bear the burden of proving their claims at trial, the movants (Recker and LYP) can prevail by showing that Plaintiffs lack evidence to support an essential element of each claim on which they seek summary judgment. *See Berry v. U.S. Postal Serv.*, No. 22-3577, 2023 WL 3035371, at *2 (6th Cir. Apr. 21, 2023) ("To succeed on a claim under the FLSA, a plaintiff must prove by a preponderance of evidence that she 'performed work for which [she] was not properly compensated.'" (quoting *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999)). Still, the non-movants can take their case to a jury (or, in this case, move forward with discovery) if they can point to evidence in the record sufficient to create a genuine dispute about whether they can support their claims. If the facts, viewed in the light most favorable to the non-movants, evince such a dispute, the Court must forward the dispute to a factfinder. But if not, the movant is entitled to summary judgment.

It also bears noting that this Court does not have the responsibility to sua sponte search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). That burden instead falls

upon the nonmoving party to "set forth specific facts" or evidence in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).

## LAW AND ANALYSIS

FLSA collective actions often present nettlesome issues. This case is no exception. In their competing briefs, the parties ask the Court to address an issue that lies at the core of this action, but that has received precious little judicial attention to date—when does the workday start and end for remote workers who use computers in connection with performing their jobs? Before the Court can even reach that issue, though, a procedural question also lurks. Given that a number of parties have filed consents to join this collective action, but that the Court has yet to rule which, if any, of those parties are "actually similarly situated," *see Clark*, 68 F.4th at 1009, what is the binding effect of this decision on the rights of those opt-in plaintiffs? The Court starts with the latter question—which the parties did not raise, but which the Court is compelled to answer—and then turns to the former.

## A. The Opt-In Plaintiffs Are Conditionally Parties since the Court Has Not Yet Conclusively Determined whether They Are Similarly Situated to Lott.

Under the FLSA, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Here, 130 PCAs have opted in by filing consents to join on this Court's docket. *See supra* note 1. Typically, after an individual affirmatively joins an action by filing a written consent they "enjoy party status as if they had initiated the action." *Canaday v. Anthem Cos., Inc.*, 9 F.4th

22

392, 394 (6th Cir. 2021). But the Sixth Circuit's more recent decision in *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003 (6th Cir. 2023), calls that somewhat into question. It suggested a further step beyond merely filing a consent to join is required. According to *Clark*, "'other employees' become parties to an FLSA suit (as opposed to mere recipients of notice) only after they opt in *and the district court determines—not conditionally, but conclusively—that each of them is in fact 'similarly situated' to the original plaintiffs*." 68 F.4th at 1009 (emphasis added).

In other words, *Clark* creates a two-step process for courts. *See McCall v. Soft-Lite L.L.C.*, No. 5:22-cv-816, 2023 WL 4904023, at *5 (N.D. Ohio Aug. 1, 2023). At the first step, a court "makes an initial determination on whether the named plaintiffs are similarly situated to the other, potential opt-in plaintiffs." *McElwee v. Bryan Cowdery, Inc.*, No. 2:21-cv-1265, 2023 WL 4423880, at *11 (S.D. Ohio July 10, 2023). Here, the Court decided that issue in the affirmative. (*See generally* Doc. 46). Then there is the second step, which "occurs after the close of discovery and requires that the Court make a conclusive determination on whether the named plaintiffs are 'in fact similarly situated' to opt-in plaintiffs." *McElwee*, 2023 WL 4423880, at *11 (quoting *Clark*, 68 F.4th at 1009–10). And *Clark* instructs that the "'other employees' become parties to [the] FLSA suit … *only after*" that latter determination takes place. 68 F.4th at 1009 (emphasis added).

That framework leaves this case in something of a unique procedural posture: the parties filed dispositive motions before the close of merits discovery and before the Court has conclusively determined whether all opt-in Plaintiffs are similarly

23

situated. The question therefore arises whether the Court's decision today can bind the opt-in Plaintiffs. While the FLSA's text may suggest that merely filing a consent "in the court in which such action is brought" is enough to make the opt-ins "a party plaintiff," 29 U.S.C. § 216(b), such that they are bound by this Court's decision on the merits, the Sixth Circuit has clearly stated that a conclusive determination on the similarly-situated requirement is also a necessary prerequisite. In light of *Clark*, then, the Court finds that, currently, the 130 opt-in Plaintiffs are only conditionally parties. In other words, as to any claim that moves forward, the opt-ins will remain part of the suit, subject to any challenge Defendants may wish to raise at the close of discovery as to whether the opt-ins (or only some of them) are in fact similarly situated. But as to any claims that the Court dismisses today, the Court's order will not have res judicata effect as to those currently-only-conditional parties.[21]

## B.    FLSA, OMFWSA, and Ohio Constitutional Claims.[22]

Turn now to the merits of the issues before the Court. The Court agrees with the parties that, on the current record (which is mostly devoid of factual disputes on the relevant facts), the Court needs to decide when the workday starts and ends for PCAs like Lott, or, as Defendants instead characterize it, whether time spent logging

---

[21] This finding does not impact the Court's past decisions that opt-ins Plaintiffs have discovery obligations. *See, e.g.*, *Morse v. Fifty West Brewing Co.*, No. 1:21-cv-377, 2025 WL 1399671, at *1–3 (S.D. Ohio May 14, 2025). Holding otherwise would interfere with the Court's ability to make a conclusive determination on the similarly-situated issue at the close of discovery.

[22] While Plaintiffs assert both federal and state-law claims, the Court analyzes only the federal overtime claims because Ohio Revised Code § 4111.03(A) "expressly incorporates the standards and principles found in the FLSA." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). The parties agree the claims rise and fall with each other as well. (*See* Doc. 41, #10764 n.3; Doc. 42, #10792 n.8).

in and passing through digital security doors constitutes compensable activities for remote workers. But to address those questions, the Court must first set the historical stage on which the answers to these modern problems rest.

Start with a basic proposition: in our tripartite system of government, the Legislature makes the law, the Executive enforces it, and the Judiciary interprets it. *See* U.S. Const. art. I, § 1; art. II, § 1; art. III § 1. At times, these co-equal branches make determinations that prompt responses from another. The birth of the FLSA, and the Portal-to-Portal Act after it, involves one such interaction.

In 1938, Congress enacted the FLSA, which "established a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek." *Integrity Staffing Sols. v. Busk*, 574 U.S. 27, 31 (2014). Somewhat problematically, though, the Act, which concerned *employment*, did not define the terms "work" or "workweek." *Id.* Faced with those interpretive gaps in the law, the Supreme Court bestowed broad meanings on both terms. *Id.*

First, in *Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, the Court defined "work" under the FLSA as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." 321 U.S. 590, 598 (1944). With that definition in hand, the Court found that the time iron ore miners spent traveling from the mine entrance to the underground "working face" (i.e., the place on the underground seam where miners were actually engaging in the "day's duties" of digging for iron ore) was compensable work. *Id.* at 597–99. And as for "workweek,"

25

just two years later the Court said that statutory term encompassed "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–91 (1946). The *Anderson* Court, relying on both definitions, also held that "time spent in walking to work on the employer's premises, after the time clocks were punched" was compensable under the FLSA. *Id.* at 691–92.

Those decisions proved a boon to employees. So much so that in the six months following *Anderson*, employees filed well over one thousand FLSA-based lawsuits. *Busk*, 574 U.S. at 31–32. Less than a year after *Anderson*, though, Congress weighed in. What resulted was the Portal-to-Portal Act, which swung the pendulum the other way in the form of two exemptions from FLSA liability, now codified in 29 U.S.C. § 254. *Id.* at 32. Specifically, the Portal-to-Portal Act narrows the Supreme Court's previous interpretations and exempts employers from liability for failing to pay employees minimum wage or overtime "for or on account of any of the following activities":

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).[23] The first exemption relates to physical movement, for example from a plant entrance to a factory floor. The second concerns itself with the acts the employee is undertaking. As to both, though, the phrase "principal activity or activities" is the statute's linchpin. And in the years since, the Supreme Court has repeatedly said that this phrase embraces "all activities which are an *integral* and *indispensable* part of the [employee's] principal activities." *Busk*, 574 U.S. at 33 (emphasis added) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005)). But that definition only kicked the can down the road so far—the words integral and indispensable themselves also needed defining. In *Busk*, the Court took up that task. It defined "integral" to mean "belonging to or making up an integral whole; constituent, component; specifically necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage." *Id.* (cleaned up) (quoting 5 Oxford English Dictionary 366 (1933)). As for "indispensable," the *Busk* Court said that "when used to describe a duty" it means an activity "that cannot be dispensed with, remitted, set aside, disregarded, or neglected." *Id.* (cleaned up) (quoting 5 Oxford English Dictionary 219 (1933)).

Taking those definitions together, the Supreme Court found "an activity is … integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.* Then, the *Busk* Court offered examples both of activities that pass that test, and those that

---

[23] There is an exception to this exemption—"work compensable by contract or custom" as outlined in 29 U.S.C. § 254(b). *Busk*, 574 U.S. at 32.

fail it. Compensable activities include "the time battery-plant employees spent showering and changing clothes because the chemicals in the plant were 'toxic to human beings'"; as a result, such activities were "indispensable to the performance of [employees'] productive work and integrally related thereto.'" *Id.* at 34 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 249, 251 (1956)). So too for any "time meatpacker employees spent sharpening their knives because dull knives would 'slow down production' on the assembly line, 'affect the appearance of the meat as well as the quality of the hides,' 'cause waste,' and lead to 'accidents.'" *Id.* (quoting *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956)). By contrast, in *IBP, Inc. v. Alvarez*, the Supreme Court found "time poultry-plant employees spent waiting to don protective gear" noncompensable "because such waiting was 'two steps removed from the productive activity on the assembly line.'" *Id.* (quoting 546 U.S. at 42); *see also* 29 C.F.R. §§ 785.24, 790.8. In other words, while donning and doffing protective gear itself is integral and indispensable (and therefore compensable under the FLSA), time spent waiting to engage in those activities is not.

### 1. PCAs' Boot-Up and Shut-Down Processes Are Not Compensable under the FLSA, Except for those Steps Involving Applications which Are Integral and Indispensable to Their Principal Duties.

With these general principles and the Supreme Court's guiding examples in mind, the Court turns to the present dispute: is the time PCAs spend booting up and shutting down their computer "integral and indispensable to the principal activities that [they are] employed to perform"? *Busk*, 574 U.S. at 33. Three cases weigh heavily on that analysis: (1) *Busk* itself; (2) *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th

1033 (10th Cir. 2021); and (3) *Cadena v. Customer Connexx LLC* (*Cadena I*), 51 F.4th 831 (9th Cir. 2022). The latter two cases confronted similar fact patterns to the one present here, but in the context of physical call centers. So far as the Court can tell, no published decision yet addresses these facts in the remote-work setting, which presents unique considerations. While it takes a bit to explain why, ultimately the Court finds that these three cases illustrate why Plaintiffs' claims partially fail to pass muster.

Start with *Busk*. There, warehouse workers were required to undergo antitheft security screenings each day before leaving their worksite. *Busk*, 574 U.S. at 29–30. They claimed their employer violated the FLSA by failing to compensate them for the time spent waiting for, and then actually undergoing, those screenings. *Id.* at 30. Although that process could take up to twenty-five minutes each day to complete, the Supreme Court held this time was noncompensable—instead, waiting for and undergoing the exit screenings were "postliminary activities" under 29 U.S.C. § 254(a)(2). *Id.* at 30, 35. The screenings were not "integral" to the employees' principal activities because they "were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment." *Id.* at 35. And the screenings were not "indispensable" because the employer "could have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.* In so holding, the Supreme Court additionally emphasized that the integral-and-indispensable test "is tied to the productive work that the employee is *employed to perform*," and that just because an employer *requires* a given activity

does not necessarily render that activity compensable. *Id.* at 36 (emphasis in original).

Next, turn to the two cases where federal courts of appeals (albeit not the Sixth Circuit) have applied the integral-and-indispensable test to fact patterns involving call-center employees—or more specifically, employees who work in person at physical call centers.[24] First, in *Peterson*, the Tenth Circuit addressed employees whose principal activities were "servicing student loans by communicating and interacting with borrowers over the phone and by email." *Peterson*, 15 F.4th at 1035. The steps these employees took before clocking in (but after arriving at the physical office), were quite similar to the facts here (e.g., waking up the computer, entering credentials, opening various applications). *See id.* at 1035–36. All of those pre-shift activities combined took about two minutes each shift. *Id.* at 1036.

Unlike the outcome in *Busk*, the Tenth Circuit found that these "pre[-]shift activities of booting up a computer and launching software [were] integral and indispensable to [the employees'] principal duties." *Id.* at 1041. While the *Peterson* Court conceded that "booting up a computer and launching software [were] not the work that [Defendant] employ[ed] the [employees] to perform," it nonetheless likened

---

[24] Indeed, both the Ninth and Tenth Circuit explicitly cabined their holdings to the physical-work world. *Cadena I*, 51 F.4th at 834 n.1 ("Our holding is limited to the facts presented in this case—that is, Appellants using employer-provided computers to perform their duties while working at a central work site. We are not asked to consider, and offer no opinion on, whether the same time would be compensable under the FLSA if Appellants worked remotely or used their personal computers to perform these duties."); *Peterson*, F.4th at 1040 ("[W]e need not speculate about the FLSA's application to teleworkers or the pandemic's broad implications for our digital age. We need only decide the case before us, which doesn't concern teleworking.").

those activities to the preparation of tools necessary for the day's work, activities like those at issue in *Steiner* or *Mitchell*. *Id.* at 1038–40, 1049. The boot-up process consisted of activities integral to the employees' principal duties because (1) there was a "clear connection between the computers and software programs and the work the [employees were] employed to perform"; (2) the employees made "consistent use of the computer and its programs to perform their work"; and (3) "the data and tools necessary to [the employees'] principal duties exist on the computer," meaning the computer was thus "intrinsic" to "servicing student loans and communicating with borrowers." *Id.* at 1041–42. As to indispensability, the court found that prong was easily satisfied based on the employer's apparent concession and because the employees needed to boot up their computers in order to access the systems they operated throughout the day. *Id.* at 1041. The court was also unpersuaded by the employer's analogy—that the boot-up and login steps the employer required were the "the modern equivalent of the factory worker standing in line at the physical time clock." *Id.* Rather, the court found that "unlike a time clock [which the employee does not use to perform his or her job] … the computer itself is an integral tool for the work the individual is employed to perform." *Id.* So in the Tenth Circuit, booting up and logging into a computer are compensable activities for employees in physical call centers—even though standing in screening lines to enter the workplace would not be.

In *Cadena I*, the Ninth Circuit reached the same conclusion. There, the employees' primary responsibilities, much like in *Peterson*, were "to provide customer

service and scheduling functions for customers over the phone." *Cadena I*, 51 F.4th at 834. And because the employees could not perform those principal duties "without a functional computer," the court found that "booting up their computers at the beginning of their shift [wa]s integral and indispensable and therefore compensable under the FLSA." *Id.* at 840. In other words, waking up or hitting the power button on the computer was "the first principal activity of the day." *Id.* at 839.

In reaching this conclusion, the Ninth Circuit rejected the district court's approach, which had "asked whether 'engaging with a computer and loading a timekeeping program to clock in' [was] integral to the employees' duties" and which had "analogized boot up time to waiting in line to clock in." *Id.* at 839. The *Cadena I* Court found the analogy inapt because it was too narrow—"[i]f there [was] an analogy to be made to waiting in line to clock in, it would be the time it takes the computer to pull up the timekeeping program once an employee has booted up the computer." *Id.* at 839 n.5. Additionally, the *Cadena I* Court reframed the inquiry to "whether engaging the computer, which contains the phone program, scripts, customer information, and email programs, [wa]s integral to the employees' duties." *Id.* at 839. Put differently, the court "evaluate[d] the importance of booting up the computer to the employees' primary duties of answering calls and scheduling rather than to their need to clock in using the electronic timekeeping system." *Id.* Framed in this way, the Ninth Circuit found the answer clear: "call center employees cannot perform their principal duties without first booting up their computers." *Id.* The Court notes that in addition to the Ninth and Tenth Circuits, a few district courts have weighed in on

32

FLSA claims for physical call centers and come out the same way as well. *See Wilson v. Peckham, Inc.*, No. 1:20-cv-565, 2021 WL 3168616, at *4 (W.D. Mich. July 26, 2021) (collecting cases).

So where do these precedents leave the Court? At first blush, it would appear that both *Peterson* and *Cadena I*, support Plaintiffs' arguments that their pre-shift, post-meal break, and post-shift activities are compensable. But in addition to the unique considerations attendant to the remote-work environment here, the Court does not find *Peterson* or *Cadena I* persuasive.[25] Both cases simply depart too far from the moorings of *Busk* and the Portal-to-Portal Act.

In the Court's view, *Peterson* and *Cadena I* focused too heavily on the indispensable-side of the integral-and-indispensable formula. But to be a principal activity, and therefore compensable under the FLSA, that activity must be *both* (1) integral (i.e., intrinsic to the function an employee is employed to perform) *and* (2) indispensable. *Busk*, 574 U.S. at 33. For present purposes, the Court does not quibble with the Ninth and Tenth Circuit's indispensability findings.[26] It strikes the

---

[25] While this Court, and the Sixth Circuit, look to other circuits for guidance, it is "not bound by the law of other [c]ircuits." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010) (quotation omitted). Additionally, as already discussed, the Ninth and Tenth Circuits cabined their decisions to the physical-work world. *See supra* note 24.

[26] As for indispensability, Defendants argue that while it would be "foolish," they "could theoretically make [their] work computers completely unsecure and easily accessible to anyone in the physical presence of the computer by disabling any locking and security features on the computer." (Doc. 41, #10767; *see also* Montgomery 2d Decl., Doc. 41-1). Plaintiffs consider this hypothetical "absurd." (Doc. 42, #10782). While the Court does not agree with Plaintiffs' strong characterization, the Court ignores the hypothetical for several reasons. First, it ignores that PCAs were likely encouraged to shut down their computers by supervisors, which would necessarily require boot-up time at the start of each shift. (Doc. 35-5, #481–82; Doc. 35-6, #532, 535–36). Second, Defendants' own claims about the importance

33

Court as correct to say that computer-based employees need to utilize a computer to do their work, and that to do so they must first turn that computer on and ensure it is functioning with all the necessary applications. In other words, these employees could not do their jobs without turning on their computers—which makes that activity indispensable. *Id.*

But the Court is unconvinced that the simple act of waking up or pressing the power button of a computer makes that act an "integral" part of "the productive work that the employee is *employed to perform*." *Id.* at 36. That is so even though, as the two appellate court decisions noted, "the data and tools necessary to [the employees'] principal duties exist on the computer" (as would seem to be the case with any computer-based job). *Peterson*, 15 F.4th at 1041–42; *Cadena I*, 51 F.4th at 840.

To see what gives the Court pause, start by recalling that the focus under the FLSA is whether a given *activity* is integral, not whether a given *tool* is integral. So, for example, in *Mitchell*, the question was not whether knives were integral to meatpacking employees' principal job duties, but rather whether the activity of "sharpening their knives" was. 350 U.S. at 261 ("The only question … is whether the knife-sharpening *activities* of the employees [are compensable]." (emphasis added)). The activity, not the implement, is what matters. Separately, recall how the Supreme Court defined the term integral: those activities which "belong[] to or mak[e] up an

---

of securing the patient health information (PHI) that they handle belies the feasibility of their hypothetical. (*See* Doc. 41, #10759–60). Third, consistent with the Court's finding below, the Court does not find that the steps that would be eliminated in this hypothetical are integral to PCAs' principal activities, so even if these activities were indispensable, it would not make a difference.

integral whole" or "form[] an intrinsic portion or element," as opposed to those activities which are merely adjuncts or appendages. *Busk*, 574 U.S. at 33.

So here, the question is not whether *a computer* is integral to a PCA's job activities—the Court agrees that it is. *See Peterson*, 15 F.4th at 1041 ("[T]he computer itself is an integral tool for the work the individual is employed to perform."). Rather, the question is whether *the activities* of merely turning the computer on and logging in are integral to the employees' duties. The Court concludes that they are not. Turning on a computer and logging in merely opens up an innumerable realm of possible uses and functions for the user. Some of those activities are work-related, others are not. For example, the Court is hard-pressed to imagine that anyone would consider activities like playing Sudoku online, perusing Reddit, or reading an article on CNN.com before the start of a shift are an intrinsic part of most computer-based jobs. On the other hand, there are clearly applications and websites that allow activities that are essential ("integral," if you will) to those jobs; applications and websites that are likewise accessible only through the computer.

Against that backdrop, *Peterson* and *Cadena I* misstepped in two ways in how they characterized the activity at issue. First, they seemed to conclude that *all* activities related to a given tool (here a computer) are integral, so long as at least *some* of the activities are. For the *Peterson* Court, "[b]ooting up the computer" was integral because "the data and tools necessary to those principal duties *exist[ed] on the computer*." 15 F.4th at 1041–42 (emphasis added). And for the *Cadena I* Court, "engaging the computer" was integral because the computers "*contain[ed]* the phone

program, scripts, customer information, and email programs" used by the employees. 51 F. 4th at 839 (emphasis added). But in focusing only on the potential work-related contents and functions of computers, they ignored the unrelated ones.

Second, their description of the activity suffered from a levels-of-generality problem. Phrases like "engaging the computer" serve only to mask the actual activity at issue. To see why that is so, consider another activity that could be described in equally broad terms—"talking with others." Stated at that level of generality, call-center employees may engage in the activity of "talking with others" when they go through a security check-in at work, while at the same time "talking with others" is an apt description of their principal job duties. But the "others" to whom they speak while waiting in the security line differ from the "others" on a customer call, and that difference matters in deciding whether the activity—talking with others—is "integral" to performing their job. In other words, one would struggle to characterize "talking with security guards" as integral to the call-center employee's job, even though "talking with customers" clearly is. The broader point is simply that activities need to be described with an appropriate level of granularity in undertaking the integral-to-the-job analysis. And "engaging the computer," in this Court's view, falls short of the requisite level of granularity.

It is certainly true that engaging with *certain programs* or *particular applications* could be similar to "preparing tools." *Peterson*, 15 F.4th at 1038–40, 1049. But there are many *other* steps that workers take on a computer that simply are not. As noted, turning on a computer merely leads to an array of potential

36

activities; some of those are intrinsic, and others are adjunct or unrelated, to the performance of work that computer-based employees are hired to perform. In a sense, a computer is a Swiss Army knife—it can be configured for a variety of different tasks, and only some are integral to the performance of an employee's job functions. Given that reality, the Court finds that merely "engaging with" a computer, broadly understood, is not integral to an employees' principal activities, even if the principal activities are admittedly computer-based. Rather, turning on a computer is a preliminary activity. 29 U.S.C. § 254(a)(2). And in a similar vein, after a remote employee starts his or her computer, the activities that he or she undertakes are not automatically rendered a principal activity merely because the work computer is functioning.

So, what is the test? Stated slightly more specifically, what is the correct level of generality to apply when considering computer-based activities? Given the above-discussed considerations, the Court concludes that the workday starts at the moment a remote worker opens and begins operating a program or application they use as part of the principal work activities they are employed to perform. By the same token, the workday ends at the moment the employee closes out of the last such program or application. In the Court's view, this better reflects the relationship between the employee and the computer in terms of job performance.

Further lending credence to this view, a rule that instead focused simply on when the employee starts the computer would lead to odd results. To see why, change the computer environment for the at-home worker here only slightly. Imagine that

37

instead of the employer supplying a computer, the employer has the at-home employees use their own computers to remote-in to a virtual work environment hosted on the employer's servers. Measured against the test set forth in *Cadena I* and *Peterson*, hitting the computer start button in that setting is just as integral to the employee's job as if it were an employer-supplied computer. After all, in both settings, "call center employees cannot perform their principal duties without first booting up their computers." *Cadena I*, 51 F.4th at 839. But that means that if an employee powered on her own computer, for her own purposes, that would start that employee's workday. That can't be. In short, the question is not when an employee has powered on or logged into their computer. Rather, the question is when they have configured that computer to perform the tasks they are employed to perform—or stated differently, when they have loaded the first application that they use to perform their job.

Applying that rule here results in the partial failure of Plaintiffs' claims. Start with the basics. "Whether an activity is excluded from hours worked under the FLSA … is a mixed question of law and fact." *Cadena I*, 51 F.4th at 835. "The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law." *Id.* Accordingly, the Court's first step is to identify PCAs' principal duties or the work they are employed to perform—a question of fact. *See id.* at 837–38. Here, the parties all agree those principal duties are to answer and handle "inbound calls from clients' patients." (Doc. 35-16, #922, 931, 939–40; Doc. 35-18, #1029; Doc. 42, #10783). Further, viewing the facts in the light most favorable to the

PCAs, as the Court must at this stage, Defendants required PCAs to be call-ready at their shift-start time and after breaks to engage in these principal duties, which in turn required them to have all necessary applications up and running at the start of their shift. (*See* Doc. 35-5, #490; Doc. 35-6, #542–43; Doc. 35-9, #650; Doc. 35-10, #692).

Next, the question becomes whether the boot-up and login process associated with being call-ready and the shut-down steps PCAs took are integral and indispensable to their principal duties or merely preliminary (for boot-up and login) or postliminary (for shutdown). Consistent with the Court's above determinations, the Court finds that many of the activities involved in those processes are merely preliminary or postliminary, and therefore noncompensable under the FLSA. Specifically, the Court finds the following activities to be preliminary or postliminary: turning on or waking up the computer; entering a username and password to access the computer; dual-authenticating through Duo; opening the timekeeping system; accessing a VPN, on the front end; and shutting down the computer, locking the screen, or putting it in sleep mode, on the back end. While all of those activities may in some sense be indispensable, they are not integral to the employees' principal duties of answering inbound calls.

In contrast, the Court finds that when PCAs open and begin operating any applications they primarily work in or use throughout the workday in connection with answering or handling such inbound calls, those activities are both integral and indispensable to their work. These include accessing Defendants' phone system,

workflow system, directory database, or a client's EMR system. At this stage, it is unclear how frequently, and for what purpose, PCAs used email or Microsoft Teams, but based on further factual development those could potentially be included as well. In sum, PCAs' workdays start when they access one of the integral-and-indispensable programs or applications just listed; their workdays correspondingly end when they close out of the last such program or application.[27]

Plaintiffs, by contrast, argue that "engaging the computer" is the activity that begins the workday. (Doc. 42, #10795). But, in making that argument, they rely on *Peterson* or cases that primarily relied on *Peterson*. (*See id.* at #10796). *See Garcia v. Vertical Screen, Inc.*, 580 F. Supp. 3d 79, 86–87 (E.D. Pa. 2022) ("The only federal appeals court to directly address the issue in this case is the Tenth Circuit, in *Peterson*."); *Wilson*, 2021 WL 3168616, at *4 ("*Peterson* is the most similar to this [case]."). For the reasons already stated, the Court concludes that *Peterson* does not apply to the remote-work context here. The Court is also not persuaded that Defendants' call-ready policy would transform preliminary activities into principal ones—just because an employer requires an employee to undertake preparatory activities does not in and of itself make the work of performing those activities compensable. *See Stidham v. Day & Zimmermann NPS, Inc.*, No. 3:06-0665, 2007 WL

---

[27] One additional nuance warrants discussion. In the rare instances when a computer update or technical issue might keep a PCA from performing their principal duties at their scheduled shift time, *see supra* note 11, the PCA should still be compensated for that time. That's because under 29 C.F.R. § 790.7(h), "when an employee 'is required by his employer to report at a particular hour … where he performs his principal activity, if the employee is there at that hour ready and willing to work but for some reason beyond his control there is no work for him to perform until some time has elapsed, waiting for work would be an integral part of the employee's principal activities.'" *IBP*, 546 U.S. at 41.

9684060, at *6 (M.D. Tenn. Sept. 10, 2007) (explaining that the court found "no principled difference between" the employer's requirement to arrive five minutes early to pick up their security badges for the day "and the requirement that employees catch a scheduled bus to arrive on the tarmac to work their construction jobs … or that employees pass through a gauntlet of security measures in order to begin work in a nuclear power plant").

Next, Plaintiffs rely on a United States Department of Labor Fact Sheet, which applies to call centers and states that "[a]n example of the first principal activity of the day for agents … in call centers includes starting the computer to download work instructions, computer applications, and work-related emails." (Doc. 42, #10796–97 (quoting *Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA)*, U.S. Dep't of Lab. Wage & Hour Div. (July 2008), https://perma.cc/AL7E-DRUP)). Even if this interpretation of the FLSA carried any interpretive weight, *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–03 (2024), it is unclear whether it applies to the remote-work context, especially given that it was published long before remote work became ubiquitous. As a result, the Court finds it unpersuasive.

In sum, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment as to Counts I and II to the extent Plaintiffs' claims rely on the preliminary and postliminary activities the Court identified above. That said, this holding does not apply to either (1) time Defendants did not compensate PCAs for when PCAs engaged an integral-and-indispensable program or application before clocking in (or in the case of the end of day, after clocking out), or (2) the rounding-policy theory

41

Plaintiffs' advance, which is addressed below. As to the former, Defendants assure the Court that this time "constituted the lion's share of the off-the-clock work."[28] (Doc. 42, #10795 n.9). Consistent with that assertion, and the lack of record evidence on that topic, the Court finds there is genuine dispute of material fact remaining as to how much time the PCAs spent utilizing the integral-and-indispensable programs or applications identified above before clocking in or after clocking out.

### 2. Defendants' De Minimis Argument is Premature.

Defendants also urge the Court to find that the time PCAs spent booting up and shutting down their computers is noncompensable under the de minimis doctrine. (Doc. 41, #10767–68). Given the above, the Court applies this argument only to the remaining portions of Plaintiffs' FLSA and Ohio labor law claims (i.e., even less time than the time for which Defendants initially advanced this argument). Under the de minimis doctrine, "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded." *Peterson*, 15 F.4th at 1042 (quoting 29 C.F.R. § 785.47); *see also Cadena v. Customer Connexx LLC* (*Cadena II*), 107 F.4th 902, 908 (9th Cir. 2024) (determining the de minimis doctrine is still generally good law after *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014)).

---

[28] Defendants may argue that it is undisputed that in the vast majority of instances, Lott and Butler clocked in before entering the phone system, and therefore the Court should grant summary judgment entirely on the uncompensated time issue. (Doc. 45, #10928; s*ee also* Doc. 35-5, #490–91; Doc. 36-6, #536–38; Doc. 37-3, #1498, 1574). But that evidence concerns only whether PCAs accessed the phone system, and not other integral-and-indispensable applications, after clocking in.

In assessing whether this doctrine relieves an employer of its obligation to compensate its employees for work time, courts balance three factors: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether the employee performed the work on a regular basis." *Peterson*, 15 F.4th at 1042 (cleaned up). *But see Cadena II*, 107 F.4th at 911–12 (explaining that "employers must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes" (cleaned up)). Ultimately, it's the employer's burden "to show that the time spent on the activity in question was de minimis." *Cadena II*, 107 F.4th at 911. At the outset, courts must also "first estimate the amount of time at issue." *Peterson*, 15 F.4th at 1042. And on that front, the Court is cognizant that "[d]etermining whether or not time is de minimis is a fact-specific inquiry that should properly go before a jury when factual disputes exist as to how much time was actually spent." *Garcia*, 580 F. Supp. 3d at 89; *see also Peterson*, 15 F.4th at 1043 (discussing expert testimony estimating the amount of time at issue).

Overall, Defendants do not carry their burden of showing that the de minimis doctrine applies because, at least at this point, too much is up in the air. In part that is because the Court just now set forth its determination as to the activities that are, and are not, compensable under the law. *See Johnson v. Koch Foods, Inc.*, 670 F. Supp. 2d 657, 672 (E.D. Tenn. 2009) ("At this point there has been no finding as to what activities are compensable so there can be no application of the de

minimis doctrine on that basis alone." (emphasis omitted)). But, be that as it may, the Court has no good estimate, for example, of even the amount of time at issue.

Additionally, Defendants fail to engage with the relevant standard. They do not point to record evidence indicating the administrative difficulty in recording this potentially uncompensated time. Instead, they broadly state that the time PCAs spend "passing through [its] security protocols … is … often immeasurable." (Doc. 41, #10767). Unfortunately, this ambiguous estimate of the *amount* of that time gives the Court no idea of the potential technical hurdles Defendants may face in *recording* it. Instead, Defendants complain that with remote employees, employers may have "no reasonable way … to monitor" what PCAs are actually doing at home (e.g., getting a snack, going to the bathroom). (*Id.* at #10768). But those concerns largely go towards what employees are doing during the continuous workday, not the administrative difficulty in tracking the time spent to load programs and the like. In theory at least, Defendants may have data that reflects every keystroke or action PCAs take on their work computers. *See Peterson*, 15 F.4th at 1044–45 ("When the amount of time at issue can be reasonably estimated, the practical administrative burden tends to be low and weighs against a de minimis finding. … [The employer] already has available data from which the time at issue can be estimated."). Accordingly, the first factor would weigh against applying the doctrine on the record here.

Next, in considering the aggregate size of the claim, the Court considers both "the aggregate size of the claim for all the employees who opted into this collective action" and "the aggregate claim for a single employee." *Id.* at 1046–47. But neither

party has presented such data to the Court. Finally, based on the undisputed facts, PCAs regularly perform the same pre-shift and post-shift activities, which weigh against a de minimis finding. *Id.* at 1048.

In sum, it's premature to potentially apply the de minimis doctrine given that the Court just defined the activities that start and end PCAs' workday. Moreover, on the current record, the balance of factors would weigh against applying the de minimis doctrine.[29]

### 3. There Is a Genuine Dispute of Material Fact as to whether the Rounding Policy Systematically Advantaged Recker and LYP.

Plaintiffs advance an alternative argument for how Defendants violated the FLSA. They claim Recker and LYP "maintained an unlawful time-rounding policy that did not comply with 29 C.F.R. § 785.48(b)." (Doc. 70, #11184). Defendants respond that their policy is neutral as written and in application, and therefore lawful. (Doc. 41, #10768–71).

The Department of Labor has endorsed rounding practices for over sixty years and federal courts have long applied the Department's rounding rules to FLSA claims. *See Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*, 821 F.3d 1069, 1075 (9th Cir. 2016) (citing Dep't of Lab. Wage & Hour Div., 26 Fed. Reg. 190, 195

---

[29] Beyond the de minimis *time* defense, it appears that case law in some circuits may also recognize a distinct de minimis *activity* defense. *See, e.g., Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008) (explaining the law in the Second Circuit "is that a *de minimis* principal activity does not trigger the continuous workday rule"). Under the latter defense, it seems that where the effort associated with a given activity is de minimis, courts hesitate to find that the activity is a "principal activity." *See id.* So far as the Court can tell, Defendants have not pressed a de minimis activity argument, at least as of yet. So the Court reserves judgment on whether that defense exists under the FLSA, and how it would apply here.

(Jan. 11, 1961)). Rounding policies are acceptable when they are "used in such a manner that [do] not result, over a period of time, in failure to compensate [] employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). They must be "neutral, both facially and as applied." *Houston v. St. Luke's Health Sys.*, 76 F.4th 1145, 1150 (8th Cir. 2023).

Courts evaluate rounding policies with several regulation-based considerations in mind. First, § 785.48(b) seems to contemplate employees collectively, so courts consider a rounding policy's effect on both individual employees and employees as a group. *See Corbin*, 821 F.3d at 1077. *But see Houston*, 76 F.4th at 1151 ("[W]e need not resolve whether an employer runs afoul of the rounding regulation whenever it undercompensates *any* individual employees over a period of time or only when it undercompensates employees *as a whole*, including those who were overcompensated or neutrally compensated … [because the] policy did both." (emphasis in the original)). Second, "[t]he regulation anticipates that, over time, rounding up for late arrivals and early departures will generally balance so that, in the end, the employee is fully compensated for all time worked." *Stidham*, 2007 WL 9684060, at *7. But it "does not contemplate the situation where an employer allows rounding when it benefits the employer without disciplining the employee; but disciplines the employee when the rounding does not work to the employer's advantage." *Austin v. Amazon.com, Inc.*, No. C09–1679, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010). At bottom, "[i]f an employer's rounding practice does not permit both upward and downward rounding, then the system is not neutral." *Corbin*,

46

821 F.3d at 1077. Combining these pieces, rounding policies that "systematically undercompensate[] employees, by only rounding down" violate the FLSA. *Id.* at 1078–79 (cleaned up); *Boone v. PrimeFlight Aviation Servs., Inc.*, No. 15-cv-6077, 2018 WL 1189338, at *7 (E.D.N.Y. Feb. 20, 2018) (collecting cases), *R&R adopted*, No. 15-cv-6077, 2018 WL 1187402 (E.D.N.Y. Mar. 7, 2018).

Here Plaintiffs agree with Defendants that the rounding policy at issue is neutral as written. (Doc. 42, #10802). Nor do Plaintiffs contest Defendants' calculations of the rounding policy's impact on Lott and the five other opt-in Plaintiffs whose time entries were analyzed. (*See id.* at #10802–04). Instead, they argue that Defendants' analysis shows that the rounding policy is not neutral in application because it indicates that two-thirds of the employees lost time, which amounts to sufficient under-compensation to survive summary judgment. (*Id.* (quoting *Houston*, 76 F.4th at 1151); *see* Doc. 41, #10770 (illustrating that across their respective dates of employment, two PCAs took home slightly more compensation than they were due because of the rounding policy, but four took home less)).

The Court agrees with Plaintiffs that their rounding-policy claim survives summary judgment, but for slightly different reasons. The policy, standing alone, is indeed neutral since it rounds the same time increments in the same corresponding directions (i.e., either up or down). (*See* Doc. 35-9, #652, Doc. 35-10, #694–95). That is, under the policy itself, an employee seems equally likely to receive extra time (e.g., an 8:52 a.m. clock-in is treated as an 8:45 a.m. clock-in) as to lose time (e.g., an 8:53 a.m. clock-in is treated as a 9:00 a.m. clock-in). Nonetheless, there remain genuine

47

disputes of material fact on two interrelated issues: (1) whether the rounding policy, when considered in concert with Defendants' timekeeping and attendance / tardiness policies, remains neutral as written, and (2) whether in fact the rounding policy's effect on PCAs as a collective actually did "average out" neutrally over time. 29 C.F.R. § 785.48(b).

While a score of four-to-two out of six instances does not strike the Court as statistically significant in one way or another (given the small sample size), there's reason to believe that the same two-to-one (or more disparate) ratio also would be observed across a larger sample of PCAs. *See Houston*, 76 F.4th at 1151 (stressing the need to "distinguish statistical anomaly from discernable pattern" when evaluating whether a rounding policy averages out over time). That's because while the rounding policy, standing on its own, reads as neutral, taken together with Defendants' clock-in, clock-out, and tardiness policies, it is likely that the policy systematically favors Defendants in application.

Consider Defendants' clock-in policy, or what they refer to as the "Time Reporting Policy." (Doc. 35-9, #652). Prior to 2022, Plaintiffs were prohibited from clocking in more than ten minutes before the start of their shift.[30] (*Id*.). In fact, clocking in early constituted unauthorized overtime work,[31] which carried the threat of potential disciplinary action ("up to and including termination"). (*Id*.). If the

---

[30] While the time recording software filled out the time sheets in quarter-hour increments, it appears that Defendants also separately tracked the time when a PCA actually logged in. (*See, e.g.*, Doc. 37-3, #1499–502 (displaying Lott's actual clock-in times)).

[31] As would clocking out late. (Doc. 35-9, #652).

rounding policy hinges on the number seven, (*see id.*), then together with the clock-in limitation, the PCAs were essentially rolling a loaded dice. Pre-shift, there were more potential combinations of early clocking in that favored Defendants than Plaintiffs. Or, in other words, clocking in from 8:50 (the earliest permissible time) to 8:53 a.m. created a rounding benefit in the PCA's favor, but clocking in any time from 8:53 to 8:59 a.m. resulted in rounding that benefited the employer. And PCAs could not benefit from the rounding policy by arriving after their shift-start time either (e.g., clock in at 9:06 a.m. and have their time sheet time reflect 9:00 a.m.), because they would risk violating Defendants' tardiness policy. (*Id.* at #650). *See Austin*, 2010 WL 1875811, at *3.

Things got even worse when the clock-in policy changed in 2022. At that point, PCAs were prohibited from clocking in more than five minutes before their shift. (Doc. 35-10, #694). That's not a loaded die; it's a fixed game. There was simply no way for PCAs to benefit from the rounding policy without violating Defendants' other policies concerning unauthorized overtime work or tardiness.[32] So while a PCA could potentially benefit from the rounding policy by, for example, violating the tardiness policy more days than not, they would risk punishment (which could be severe) for violating the tardiness policy itself. That's not to say that Defendants' other, non-rounding policies were unreasonable. The Court sees nothing inherently wrong (and in fact, it seems practically reasonable) in limiting how far in advance hourly

---

[32] And the grace period that was added to the policy in 2022, (*see* Doc. 35-10, #692), does not change things because it was only five minutes. If a PCA logged in six minutes late, they would be outside of the grace period and their time entry would be rounded down.

employees can clock in or deterring them from being tardy. But in terms of how a rounding policy operates and plays out over time, those measures may add up to violate 29 C.F.R § 785.48 because of the incentive structure they create.

For those reasons, at this time, the Court is unable to say whether the limited numbers Defendants proffered (regarding only six out of over-one-hundred Plaintiffs in this case now) indicate that their rounding policy averaged out over time and was neutral in application. Stated differently, a genuine dispute of material fact still exists because the Court needs to consider the systematic effects of the policy on a larger pool of PCAs. Accordingly, the Court **DENIES** Defendants' motion as to Plaintiffs' rounding-policy claims included in Counts I and II.

## C.    Breach of Contract and Unjust Enrichment Claims.

Finally, Plaintiffs alleged that "Defendants had [] binding and valid contract[s] with [PCAs] … to pay [them] for each hour they worked at a pre-established (contractual) regular hourly rate." (Doc. 70, #11187). Further they say that these "contractual promises [were] contained in Defendants' offer letters." (*Id.* at #11188). In the alternative, Plaintiffs sue Defendants for unjust enrichment, which is a contract "implied in law" under Ohio law. (*Id.* at #11189–90). *See Miller v. Bates*, __ N.E.3d __, 2025 WL 1354426, at *3 (Ohio Ct. App. 2025) (quotation omitted).

To support summary judgment as to these claims, Defendants point to record evidence in the form of the PCAs' handbooks, in which each PCA acknowledged through signature that "[t]here is no implied employment contract created by this Handbook *or any other Company document or written or verbal statement or policy*."

50

(Doc. 35-9, #624 (emphasis added); Doc. 35-10, #666 (same)). It's therefore incumbent on Plaintiffs to "present some sufficient disagreement" through citations to the factual record that the handbooks are not applicable. *Saint Vil*, 2024 WL 3373312, at *3 (cleaned up). Plaintiff takes two approaches, but neither presents a sufficient factual disagreement to preclude granting summary judgment on these claims.

First, Plaintiffs argue that the placement of Defendants' cited language in the handbooks lessens its effect. (Doc. 42, #10804–05). But PCAs "acknowledge[d] receipt" of the entire handbook, not just part of it. (*See, e.g.*, Doc. 35-9, #659). And they further "agree[d] to read the Handbook"—and again, that meant they were responsible for reading *all* of it, not just part. (*Id.*).

Second, they argue that their breach-of-contract and unjust-enrichment claims are not premised on the handbooks, but "on Defendants' written offer letters, as well as verbal offers for payments at above minimum wage." (Doc. 42, #10805; Doc. 70, #11187–88). Even viewing "the evidence in the light most favorable to" Plaintiffs, the language in the handbooks establish that no offer letters or verbal offers could create a contract or implied contract. *Saint Vil*, 2024 WL 3373312, at *3. For instance, let's presume that Lott's offer letter *did* have terms that hinted at a contract. If that was the case, the Court first notes that Plaintiffs should have submitted it with their Response.[33] But even if they did, the Court would assume the handbook would supersede the offer letter since it presumably came *after* the PCAs accepted the job. And the same goes for verbal offers.

---

[33] Plaintiffs certainly had possession of the offer letter. (*See* Doc. 35-16, #929–30 (sharing Lott's letter with Defendant's 30(b)(6) corporate representative)).

Finally, Plaintiffs alternately asked the Court under Federal Rule of Civil Procedure 56(d) to hold off on ruling on the motion for summary judgment to allow further discovery. But the list of outstanding discovery needs they tendered in support of that request did not indicate the lack of a "full factual record" as to the contractual claims. (*See* Doc. 42, #10810–11). For these reasons, the Court **GRANTS** Defendants' motion in regard to Counts III and VI, and **DENIES** the Plaintiffs' request for additional discovery under Rule 56(d).

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 41). Specifically, the Court **DISMISSES** Counts I and II to the extent Plaintiffs' claims rely on PCAs' preliminary and postliminary activities, such as entering credentials, opening the timekeeping system, or other such activities catalogued above. But Plaintiffs may proceed on those claims to the extent they were uncompensated for principal activities such as engaging Defendants' phone system, workflow system, directory, a client's EMR system, or similar integral-and-indispensable program or application. Plaintiffs may also proceed on Counts I and II as to their rounding theory of liability. Lastly, the Court **DISMISSES** Counts III and IV in their entirety.[34]

---

[34] Plaintiffs also moved to defer considering Defendants' Motion for Summary Judgment in order to allow time to take further discovery under Rule 56(d). (Doc. 42, #10808–13). Because the Court allows several of Plaintiffs' claims to proceed, and does not find that additional discovery, or a fuller factual record, would alter any of the analysis here, the Court **DENIES AS MOOT** Plaintiffs' Cross-Motion to Stay or Deny Defendants' Motion Pursuant to Fed. R. Civ. P. 56(d) (Doc. 42).

**SO ORDERED.**

September 4, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**